UNITED STATES of America, Plaintiff,

v.

Ronald BRAMBLE, Defendant.

Crim. No. 95–00150 DAE.

United States District Court,
D. Hawai'i.

July 21, 1995.

Mark E. Recktenwald, Asst. U.S. Atty., U.S. Attorney's Office, Honolulu, HI, for plaintiff.

Hayden Aluli, Honolulu, HI, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS INDICTMENT

**DAVID ALAN EZRA**, District Judge.

The court heard Defendant's Motions on May 30, July 10, July 19, and July 20, 1995. Hayden Aluli, Esq., appeared on behalf of Defendant Bramble; Mark E. Recktenwald, Assistant United States Attorney, appeared on behalf of Plaintiff, the United States of America ("government"). After reviewing the motions and the supporting and opposing memoranda, as well as assessing the credibility of the testimony at the hearing, the court DENIES Defendant's Motion to Suppress and DENIES Defendant's Motion to Dismiss Indictment.

## BACKGROUND

In May 1993, Bramble placed an advertisement in a newspaper offering to sell four sea otter pelts for $4,000 per pelt. The sale of sea otter pelts is prohibited by the Marine Mammal Protection Act, 16 U.S.C. §§ 1372(a)(4) and 1375(b).[1] Agents of the Fish & Wildlife Service (FW) and the National Marine Fisheries Service (NMF), posing as potential buyers, contacted Bramble and arranged to meet with him on the Big Island. FW Agent Carroll Cox and NMF Agent Tommy Friel traveled to the Big Island, contacted Bramble, and arranged to meet Bramble at his home.

On May 27, 1993, at approximately 3:30 p.m., the Agents arrived at Bramble's home. He invited them in and proceeded to display the purported sea otter pelts to them. Agent Cox agreed to purchase the pelts for $3,500. During the course of this meeting, Bramble mentioned to the Agents that he also had other wildlife parts in the house. Bramble brought out portions of a bald eagle, a golden eagle, a red-tailed hawk, and a great horned owl. Possession of all of these wildlife parts is prohibited.[2]

Agent Friel testified that while Bramble went to retrieve the other wildlife parts to show Agent Cox, Friel sat at, or stood near, the dining room table. Friel testified that he noticed an amber vial which appeared to contain white residue powder, and that from past experience Friel believed the vial contained cocaine. Friel testified that he brought this to Agent Cox's attention. Friel also testified that when Bramble returned with the box containing the bird parts the Agents identified themselves. They told Bramble that sale and possession of the wild-

---

1. The court here notes that on July 20, 1995, the government moved to dismiss Count 6 of the indictment, charging Bramble with the illegal sale of sea otter pelts. The government informed the court that its expert reexamined the pelts on July 19, 1995, and determined for the first time that the pelts were in fact river otter pelts, not sea otter pelts. Based upon this new information, the government moved to dismiss the charge, and the court granted that motion. Be-cause of the dismissal of Count 6, the court granted the Defendant's motion to briefly continue the trial.

2. Possession of eagle parts is prohibited by the Eagle Act, 16 U.S.C. § 668(d). Possession of the other bird parts is prohibited by the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a).

life parts was illegal, and took custody of the animal parts. Bramble signed a release for this. They did not place him under arrest or handcuff him at this time.

After this, the relevant time frame becomes somewhat confused. Bramble states in his memorandum that after identifying themselves, the Agents continued to question him. Agent Friel testified that the Agents asked Bramble about the vial containing the white powder residue. Bramble told them it belonged to his nephew. *See also* Government's Exhibit 3. Agent Friel testified that they called for assistance from the Hawaii County Police at this time, although the time frame of this is also somewhat unclear.

Hawaii County Police Officer Almeida arrived at approximately 4:00 p.m. Agent Friel and Agent Cox both testified that Cox read Bramble his *Miranda* rights. They both testified that Bramble said he understood his rights and did not need an attorney present. Almeida testified that he was present when Bramble was read his rights and signed the waiver of rights form at 4:32 p.m. *See* Exhibit A attached to the Government's Opposition.

Almeida testified that he determined he should search the residence and asked Bramble for permission. Almeida also testified that he told Bramble that he could go and get a search warrant if Bramble was not inclined to allow them to search the house. Bramble asked how long this would take and seemed concerned about his dogs' well-being when told it would take several hours. Almeida testified that he never heard anyone threaten Bramble or his dogs. Almeida also testified that prior to the search of Bramble's house, Bramble told the officers that there were no guns in the house. Almeida stated under oath that he never drew his gun, nor did he see anyone else do so.

At 5:00 p.m., Bramble signed a waiver consenting to a warrantless search of his home. *See* Exhibit B attached to the Government's opposition. Friel stated that in order to search Bramble's home, Bramble was allowed to go into various rooms alone to control and restrain his several pit bulls.[3] Friel testified that, fearing attack, he told Bramble that if Bramble let the dogs loose Friel would "cap" the dogs, meaning that he would shoot the dogs. Friel indicated that Bramble said he would not do so and in fact, the dogs were restrained and moved without incident. Friel also testified that Bramble told the officers that there were no guns in the house. However, the Agents recovered two, loaded guns (a .22 caliber rifle and a .42 caliber pistol).[4] Friel testified that after finding these loaded weapons the Agents briefly handcuffed Bramble, removing the handcuffs periodically when Bramble was needed to subdue or move the pit bulls. Friel stated that when they were certain there were no more weapons in the house the Agents took off the handcuffs.

Bramble did not testify at the hearing. However, Bramble stated in his memorandum that one agent "flashed his gun at Bramble, and said he would 'cap'" the pit bulls, which were roaming freely about the bedrooms and bathrooms of the house. Defendant's Memorandum in Support at 2. Bramble understood "cap" to mean the agent would shoot the dogs. Bramble alleges that in addition to this exchange, the agent also "threatened to put an electric dog collar on Bramble and laughed when Bramble cringed in fear." *Id.* Bramble states that the dog collar was "kept but not used for dog training." *Id.* at 5. The government denies that either the Agents or the police officer ever drew their weapons or threatened to place the dog collar on Bramble.

After waiving his *Miranda* rights Bramble made verbal and written statements about the wildlife parts in his home. He also admitted to buying and smoking marijuana. The officers also found marijuana, and marijuana plants, which Bramble admitted were his.

---

**3.** There is some dispute whether the dogs were pit bulls or American bulldogs.

**4.** Defendant, as a prior felon, was prohibited from possessing these weapons under 18 U.S.C. § 922(g)(1). Defendant was convicted in 1979, in California for cultivating marijuana, and in 1981, on a federal charge of distribution of cocaine.

Bramble states in support of his motion that his written waivers of his right to remain silent and his right to be free from searches of his home absent a search warrant were not voluntarily given and any statements he made or evidence seized subsequent to his waiver should be suppressed.

## DISCUSSION

### I. Waiver of *Miranda* Rights

■ Before the government may introduce evidence of an incriminating statement made by a criminal defendant, it must prove a voluntary, knowing, intelligent waiver of defendant's *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (proof of waiver must be by a mere preponderance of the evidence); *United States v. Binder*, 769 F.2d 595, 599 (9th Cir.1985).

■ A valid waiver of *Miranda* rights involves a two-part inquiry. First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421–23, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Second, it must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.*

■ "Voluntariness" and "knowing and intelligent" are two distinct considerations to be analyzed separately in determining whether a *Miranda* waiver was coerced. *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). A waiver is "knowing and intelligent" if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. In evaluating the "voluntariness" of a confession, the court must determine, under the totality of the circumstances, whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988). Personal circumstances are constitutionally irrelevant absent proof of coercion. *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir.1990), *cert. denied*, 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991). The question of "voluntariness" of a *Miranda* waiver involves the same inquiry. *Connelly*, 479 U.S. at 169–170, 107 S.Ct. at 522–524.

■ The totality of the circumstances includes the background, experience, and conduct of defendant. *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–59, 60 L.Ed.2d 286 (1979). Factors to be considered to determine voluntariness include:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). A signed waiver form is only one factor to be considered. *Binder*, 769 F.2d at 599. However, although it is not dispositive, a written waiver of *Miranda* rights is "strong" evidence that the waiver is valid. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757; *United States v. Bernard S.*, 795 F.2d 749, 753 n. 4 (9th Cir.1986). There is a presumption against waiver, and the burden of showing a valid waiver is on the prosecutor. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757; *Binder*, 769 F.2d at 599.

■ Bramble argues that his waiver of *Miranda* rights and subsequent statements were not voluntarily given because the government Agents threatened to shoot his dogs, brandished a gun while making the threat, threatened to place Bramble's electric dog collar on Bramble, and "laughed when Bramble cringed in fear." Defendant's Memorandum in Support at 2. Moreover, Bramble states that he was "alone with these two Agents in his rural home, and felt they could and would injure or kill him or his dogs." *Id.* at 5. Bramble states that he signed the waivers in an attempt to appease

the Agents and because he felt he had no viable alternative.

The government argues that Bramble's waiver of his *Miranda* rights, and his subsequent statements were, under the totality of the circumstances, voluntarily given. The government denies, and the Agents testified, that they never drew their weapons or suggested that they would place a dog collar on Bramble. The court finds this testimony credible and supported by other facts. Moreover, the government points to several factors which evidence the voluntariness of Bramble's waiver: (1) Bramble was a 49-year-old, convicted felon who was well-versed in the criminal justice system;[5] (2) Bramble was neither under arrest, handcuffed, nor in custody *at the time he waived his rights;* (3) Bramble was in the familiar surroundings of his own home. The government argues that Bramble was a mature, experienced individual who was fully capable of refusing to consent if he wanted to do so.

Finally, the government states that at the time Bramble waived his *Miranda* rights the Agents had not yet made any comments about shooting his dogs. The government also states that when Friel did threaten to shoot the dogs it was out of a legitimate concern for the Agents' safety and was not made to intimidate Bramble or coerce him into making a statement. Agent Friel testified that he himself had been a breeder of these type of dogs and was aware of their nature.

The court finds that under the totality of the circumstances, after weighing the credibility of the evidence and the testimony at the hearing, when Bramble signed the waiver of his *Miranda* rights, he did so knowingly and intelligently. Bramble does not deny signing the waivers. *See Bernard S.,* 795 F.2d 749, 753 n. 4 (signed waiver "strong" evidence of valid waiver). Nor does Bramble argue that he didn't understand the waivers. There is no indication that Bramble was of insufficient intelligence to understand the rights he waived, or the consequences of his

waiver. The fact that Bramble is a convicted felon shows that he had prior experience with police procedures and suggests that he understood the nature of his *Miranda* waiver. *See Fare v. Michael C.,* 442 U.S. 707, 726, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (concluding that juvenile's prior experience with the police suggests he understood the nature of *Miranda* waiver). This militates against Bramble's argument that he signed the waivers because he "believ[ed] he had no viable alternative." Defendant's Memorandum in Support at 5. Therefore, the court finds that Bramble's waiver of his *Miranda* rights was knowingly and intelligently made.

Turning to the question of whether Bramble's waiver was voluntary, the court finds that it was. The voluntariness inquiry is not one of "but-for" causation, whereby a defendant's confession is rendered inadmissible simply because it was precipitated by police conduct. *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203–04, 50 L.Ed.2d 194 (1976). Instead, the inquiry focuses on whether the police's conduct was constitutionally acceptable. *Derrick v. Peterson,* 924 F.2d 813, 819 (9th Cir.1990). First, Bramble was not detained for an inordinate amount of time, subjected to repeated and prolonged questioning, or deprived of food, sleep, or use of bathroom facilities, thus suggesting that his will was overborne rendering his waiver involuntary. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. No more than an hour passed from the time the Agents arrived at Bramble's house, worked out the details of the sale of the illegal goods, identified themselves, called the Hawaii County police, and Bramble signed his waiver of *Miranda* rights. The waiver form shows that Bramble was read his rights at 4:30 p.m., and signed the waiver at 4:32 p.m. There is no evidence at all that the police subjected him to repeated or prolonged questioning, either prior to the waiver, or after the waiver was signed.

Bramble argues that when the Agents said they would shoot or "cap" his dogs, his waiver was rendered involuntary. The court

---

**5.** The court takes judicial notice that Bramble has been previously convicted of drug charges, in both state and federal courts. *See United States v. Bramble,* 641 F.2d 681 (9th Cir.1981), *appeal*

*after remand,* 680 F.2d 590 (9th Cir.), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982).

notes that Bramble signed the waiver of his *Miranda* rights *before* the Agents made this statement. Moreover, it is eminently reasonable for the Agents to have feared for their safety in the presence of four pit bulls, and to have made such a statement to Bramble. The government did not say, nor does Bramble argue, that if Bramble let the dogs free they would shoot Bramble, only that they would shoot the dogs.

As to Bramble's statement that the Agents threatened to place an electric dog collar on him, after a careful consideration of all the circumstances and weighing the credibility of the testimony at the hearing, the court finds that the Agents did not make such a threat to Bramble. Further, the court finds that the government's conduct was reasonable and was not such "subtle psychological coercion" sufficient to "overbear '[Bramble's] rational intellect and [ ] free will.'" *United States v. Wolf*, 813 F.2d 970, 974 (9th Cir. 1987) (quoting *Jones v. Cardwell*, 686 F.2d 754, 757 (9th Cir.1982) (further citations omitted)). Accordingly, the court finds Bramble's waiver of his *Miranda* rights voluntarily, knowingly, and intelligently given.

## II. Consent to Search

■ Police officers may conduct a warrantless search when they have obtained the voluntary consent of a party with common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 179, 181, 110 S.Ct. 2793, 2796, 2797, 111 L.Ed.2d 148 (1990). The government has the burden of proving that consent to a warrantless search was voluntary. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990); *United States v. Al–Azzawy*, 784 F.2d 890, 895 (9th Cir.1985), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). Otherwise, absent another exception to the warrant requirement, the search violates the clearly established right against warrantless searches. *See id.*

■ The extent of the search, however, must be confined to the terms of the consent given. *United States v. Sealey*, 830 F.2d 1028, 1032 (9th Cir.1987). The scope of the

consent limits the scope of a permissible search in the same manner as the specifications in a warrant. *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir.1990).

■ Whether consent to a search was voluntary or was the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 248–49, 93 S.Ct. at 2047, 2058–59; *see also Al–Azzawy*, 784 F.2d at 895 ("Voluntariness is a question of fact to be determined from all the surrounding circumstances"). No single criterion controls the determination. *United States v. Agosto*, 502 F.2d 612, 614 (9th Cir.1974) (per curiam).

■ The Ninth Circuit has held that a person in custody is capable of giving valid consent to a search. *See United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir.1989). The fact that consent is given while under arrest does not, by itself, make the search involuntary, especially where a defendant is informed of his right not to consent. *Kaplan*, 895 F.2d at 622. Nor does the fact that a defendant was handcuffed when asked for consent to search. *United States v. Castillo*, 866 F.2d 1071, 1074 (9th Cir.1988). The Fifth Amendment right to counsel is separate from the issue of consent to search; thus, a request for consent to search is "immeasurably, far removed from 'custodial interrogation.'" *Schneckloth*, 412 U.S. at 232, 93 S.Ct. at 2050.

■ The prosecutor must prove that the consent was voluntarily and freely given, *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968), based on a totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48.

■ The Ninth Circuit has stated that the following facts weigh against a determination of voluntariness: (1) the defendant was in custody; (2) the arresting officers had their guns drawn or otherwise overmastered the suspect;[6] (3) *Miranda* warnings were not given prior to the search; (4) the defen-

---

6. In *Al–Azzawy*, 784 F.2d at 895, the Ninth Circuit found that a defendant forced to his knees at  gunpoint did not consent voluntarily.

dant was not told he had a right to withhold his consent to be searched; or (5) the officers claimed that they could obtain a search warrant. *United States v. Kim,* 25 F.3d 1426, 1431 (9th Cir.1994). However, no single factor is dispositive. *United States v. Chaidez,* 906 F.2d 377 (8th Cir.1990).

■ The court finds that these factors do not weigh in favor of a finding of involuntariness in Bramble's case. First, the court finds that at the time that Bramble gave his consent to search, he was not in custody. The Agents testified that Bramble was told that he was not under arrest, and that they were going to take the animal parts with them and leave him a receipt. Second, the court finds the testimony of the officers credible that at no time did they draw their weapons, or otherwise unreasonably overmaster Bramble's will. While it is true that during part of the search Bramble was handcuffed, this came *after* Bramble gave his consent to search. Moreover, the court has found that this was done out of a reasonable concern for the officers' safety.[7] Third, the court also finds that Bramble was given *Miranda* warnings prior to a request to search. Fourth, the court finds that Bramble was told he had the right to withhold his consent to search.

Finally, the court addresses the fifth factor identified by the *Kim* court, here whether Officer Almeida's statement to Bramble that he would go and get a search warrant if Bramble refused to give his consent to search. The court finds that this statement did not render the consent involuntary under these circumstances. In *Kim,* the Ninth Circuit upheld this court's holding that a consent to search was voluntary. The Ninth Circuit reasoned that where "the officers did not claim to have a search warrant, or be able to obtain one immediately ... [nor] did they intimate that Kim's withholding of consent would ultimately be futile" weighed in favor of finding the consent to search voluntary. *Kim,* 25 F.3d at 1432.

Similarly, here Almeida did not tell Bramble that he *had* a search warrant, or that he

could get one immediately. In fact, Almeida said it would likely take several hours to obtain a search warrant, long enough for Bramble to be concerned about his dogs. The record shows that Bramble gave his consent to search the house because he had some concern about the effect of waiting on his dogs. As the Ninth Circuit stated in Bramble's previous case:

> [T]he record indicates that [Bramble] had a pit bulldog in the car and was greatly concerned about its safety.... The officers were prepared to defer search until ... a warrant had been obtained.... [I]t is apparent that [Bramble's] consent to search was given in order that he might hold the dog while the search took place, and thus avoid the need for the officers to proceed to a warrant search in his absence. It does not lie with him now to complain that the search was without warrant.

641 F.2d at 683. Nor did anyone ever tell Bramble that his refusal to give his consent to search would be a futile gesture. Based upon these circumstances, weighing all the factors present at the time Bramble gave his consent to search, this court finds that Almeida's statements did not render Bramble's consent involuntary.

■ The court finds meritless Bramble's argument that his consent was somehow rendered invalid by the Agents' denial that they were police officers. "An officer may, consistent with the fourth amendment, conceal his or her identity to obtain an invitation to enter a suspect's home." *United States v. Bosse,* 898 F.2d 113, 115 (9th Cir.1990) (per curiam) (citing *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427–28, 17 L.Ed.2d 312 (1966); *United States v. Glassel,* 488 F.2d 143 (9th Cir.1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974)). *See also United States v. Garcia,* 997 F.2d 1273, 1280 (9th Cir.1993). However, an officer may not use an invitation to enter as an excuse to "conduct a general search for incriminating materials." *Garcia,* 997 F.2d at 1280 (citation omitted.) Nor can a government agent obtain entry by "misrep-

---

**7.** It must be remembered that Bramble told the officers there were no guns in the house, and they in fact found two loaded guns. It was fair

for the officers to be concerned that a third loaded weapon might be hidden within Bramble's reach.

resenting the scope, nature or purpose of a government investigation." *Id.* (citing *Bosse,* 898 F.2d at 115 (federal agent posed as a state license inspector in order to gather evidence to support a search warrant)) (further citations omitted).

Here, Agents Cox and Friel were legally within Bramble's home; he had invited them in for the purpose of selling what he thought were sea otter pelts. Once within the home, the cocaine, which was admittedly on the dining room table, was observed in plain view. The Agents neither used Bramble's invitation as an excuse to search the entire residence nor misrepresented the scope of their investigation. Accordingly, the court finds that their entry and constructive seizure of the cocaine did not violate Bramble's Fourth Amendment rights. In addition, once Cox and Friel had lawfully gained entry and constructively seized the cocaine in plain view, their subsequent invitation of Officer Almeida did not invalidate the seizure of the cocaine. *See United States v. Glassel,* 488 F.2d at 145.

Neither did the entry of Officer Almeida invalidate the subsequent consent to search. An illegal entry into a residence generally invalidates a subsequent consent search. *United States v. Howard,* 828 F.2d 552 (9th Cir.1987). However, where an undercover agent enters at the invitation of the defendant, establishes the existence of probable cause to arrest or search, and summons help from other officers, the Seventh Circuit has held that the consent given to the undercover officer applies to the other officers as well. *United States v. Akinsanya,* 53 F.3d 852, 855 (7th Cir.1995) (citing *United States v. Jachimko,* 19 F.3d 296, 299 (7th Cir.1994)) (further citations omitted). This concept of "consent once removed" originated in *United States v. White,* 660 F.2d 1178 (7th Cir.1981), where the court held the "latter entry as being a separate intrusion in view of the fact that [an undercover agent] remained in the apartment at all times after his initial consensual entry." *Id.* at 1183 n. 3. Here, the Agents remained on the premises during the time it took for Officer Almeida to arrive. The Agents had been invited onto the premises by Bramble, and had established the existence of probable cause to arrest Bramble for the violation of the Marine Mammal Protection Act and for possession of cocaine.

Although the Ninth Circuit has not had an opportunity to directly address the Seventh Circuit's approach, it has applied reasoning in a similar context that supports the application of the Seventh Circuit's approach here. In *United States v. Rubio,* 727 F.2d 786, 796–97 (9th Cir.1983), the Ninth Circuit held that consent to search cannot be qualified to a certain number of officers. The court stated:

> Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy, and, in the instant case, any remaining expectation of privacy was outweighed by the legitimate concern for the safety of a single officer conducting a search of a house known to contain firearms.

727 F.2d at 797. The Ninth Circuit's observation that the entry of additional officers creates no additional violation applies equally here.

In this case, the entry of the additional officer does not constitute an intrusion beyond that allegedly occasioned by the original consensual entry of the Agents. After the undercover Agents had entered, established probable cause, and identified themselves as law enforcement officials, the entrance of Officer Almeida was cumulative of their presence. It presented no potential violation of Defendants' rights independent of the original entry of the Agents, which, as the court has discussed, did not violate Bramble's rights. Further, the court notes that Bramble never objected to Officer Almeida's entry or presence. Bramble never suggested that the officer leave. *Cf. Rubio,* 727 F.2d at 797 (upholding trial court finding that even if the limitation on the number of officers who could search was a valid qualification, by allowing entry of all the officers without protest, defendant had revoked his qualification.).

Bramble next appears to argue that somehow the scope of his consent was ex-

ceeded when the officers searched his home and retrieved more than wildlife parts. The court is unconvinced by this argument.

■ In assessing the limits of a defendant's voluntary consent, the court must look to the objective reasonableness of the consent—"what would the typical reasonable person have understood by the exchange between the officer and the [person consenting]?" *Florida v. Jimeno*, 500 U.S. 248, 249–52, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991); *United States v. Gutierrez–Mederos*, 965 F.2d 800, 803 (9th Cir.1992) (citing *Jimeno* ), *cert. denied*, —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993). "The scope of a search is generally defined by its expressed object." (citing *Rodriguez*, 497 U.S. at 184–185, 110 S.Ct. at 2799–2800).

In *Gutierrez–Mederos*, the Ninth Circuit held that a defendant's general response, "go ahead," to an officer's request to search for weapons and narcotics, placed no explicit limit on the scope of the search. 965 F.2d at 803–04. The court held that the defendant's statement authorized the officer to search any container within the car that reasonably could contain contraband. *Id.*

Here, Bramble signed a very broad consent to search form.[8] There are, in fact, no limits placed upon what the officers could or could not search within the residence. Moreover, Bramble signed this consent form, which states on its face that it is a Hawaii Police Department form, after Agents Friel and Cox had discussed the vial of cocaine they had seen in plain view on the dining room table. Bramble, at that point, must have known that the police would be concerned with the possibility of drugs, drug contraband, or weapons. The court finds

that it is objectively reasonable to believe that the consent to search form authorized the police officers to search for drugs, drug paraphernalia, and weapons, as well as wildlife parts. *See Smith v. Demosthenes*, 734 F.Supp. 434, 436 (D.Nev.1990) (consent to search apartment "for other male subjects" authorized officers to look under bed, where firearms were discovered, which did not exceed the scope of the search).

Therefore, based upon the foregoing analysis and authority, the court finds that Bramble's consent to search, and waiver of search warrant, was also voluntary. Furthermore, the court finds that the scope of Bramble's consent was not exceeded. Accordingly, the court DENIES Bramble's Motion to Suppress Statements and Any Physical Evidence Obtained as "Fruit" of Those Statements.

### III. Defendant's Motion to Dismiss Indictment

On June 14, 1995, Bramble filed a motion to dismiss the indictment against him on the ground that the charges[9] are unconstitutional and therefore invalid. Bramble alleges that Congress exceeded its powers under the Commerce Clause in promulgating the statutes underlying the charges. Bramble relies upon the recent Supreme Court ruling in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) in support of his argument.

### A. *UNITED STATES V. LOPEZ*

In *Lopez*, the Court affirmed the reversal of a conviction obtained under the Gun–Free School Zones Act 18 U.S.C. § 922(q)(1)(A). That statute prohibited possession of a firearm in or within 1,000 feet of a school. The

8. The form stated in pertinent part:

> You have a constitutional right not to have a search made of your premises without a search warrant and to refuse consent to such search without a warrant.
> a request is now being made to conduct a search of your premises without a search warrant for any papers, materials or objects that may be connected with any crime being investigated by the police.
> I, [signed Ronald Bramble], fully understand the above and further make the following statement:

> *I consent to a complete search by police officers of the premises described below and authorize the removal of any papers, materials or other objects therefrom:*
> *See* Government's Exhibit B attached to Memorandum in Opposition (emphasis added).

9. The charges are brought under 16 U.S.C. §§ 1372(a)(4), 1375(b), 668(d), 703, 707(a); 18 U.S.C. §§ 922(g)(1), 922(g)(3); and 21 U.S.C. §§ 841(a)(1), and 844(a). However, the court again notes that the charges brought under 16 U.S.C. §§ 1372 and 1375, relating to the purported sea otter pelts, have been dismissed.

Court narrowly held that the Gun–Free School Zones Act was invalid because the possession of a gun in a local school zone does not substantially affect interstate commerce. *Id.* at ——, 115 S.Ct. at 1634.

The Court based its decision on the lack of a nexus to interstate commerce and on federalism concerns. First, it found that the enactment of the Gun–Free School Zones Act exceeded Congress' commerce power because it regulated conduct that "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at —— – ——, 115 S.Ct. at 1630–31. The Court noted the scant findings made by Congress, and found that the activities regulated under the Gun–Free School Zones Act had but a remote connection to interstate commerce. *Id.* at ——, 115 S.Ct. at 1632.

Finally, the Court held that the Gun–Free School Zones Act infringed on the States' traditional power to regulate education, which is a "traditional concern of the States." *Id.* at ——, 115 S.Ct. at 1640 (Kennedy, J., concurring). The Act thus threatened federalism. *Id.*

Bramble asks this court to read *Lopez* broadly and invalidate 16 U.S.C. §§ 1372(a)(4), 1375(b), 668(d), 703, 707(a); 18 U.S.C. §§ 922(g)(1), 922(g)(3); and 21 U.S.C. §§ 841(a)(1), and 844(a).[10] Bramble argues that those statutes, like the Gun–Free School Zones Act, "have nothing to do with 'commerce' or any sort of economic enterprise that substantially affects interstate commerce." Defendant's Memorandum in Support of Motion at 2. Bramble argues that all of the statutes contained in the indictment against him "should be held unconstitutional and invalid as beyond Congress' powers under the Commerce Clause." *Id.*

B. *21 U.S.C. §§ 841(a)(1), 844(a)*

■ Turning to 21 U.S.C. §§ 841(a)(1) and 844(a), the court finds that there is, in fact, a direct connection between this statute and commerce. Simply put, Title 21 of the United States Code regulates commerce in drugs; Title 21 makes it illegal to manufacture, distribute, or dispense, or to possess with intent to manufacture, distribute, or dispense, a controlled substance or to simply possess a controlled substance unless the substance was obtained legally. *See* 21 U.S.C. §§ 841(a)(1) and 844.

Moreover, the Supreme Court has upheld Congress' power to regulate illegal drugs. *See Reina v. United States,* 364 U.S. 507, 511, 81 S.Ct. 260, 263, 5 L.Ed.2d 249 (1960) (referring to Congress' "undoubted power to enact the narcotics laws"); *Minor v. United States,* 396 U.S. 87, 98 n. 13, 90 S.Ct. 284, 289 n. 13, 24 L.Ed.2d 283 (1969) ("[A] flat ban on certain [drug] sales ... is sustainable under the powers granted Congress" by the Commerce Clause).

In contrast to *Lopez,* Congress has made specific findings in the instant context that illegal drugs affect interstate commerce. *See* 21 U.S.C. §§ 801(3), 801(4), and 801(6). Congress specifically stated that even local distribution and possession of illegal drugs may "contribute to the swelling of interstate traffic in such substances." 21 U.S.C. § 801(4).

■ Congress has the power to regulate wholly intrastate activities which have a substantial effect upon interstate commerce. *See e.g., Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942) (Congress has power to regulate wheat); *United States v. Darby,* 312 U.S. 100, 119–121, 61 S.Ct. 451, 459–461, 85 L.Ed. 609 (1941) (Congress may regulate wage and hour laws). Furthermore, there is ample judicial recognition that there is an interstate market for illegal drugs. *See e.g., United States v. Montes–Zarate,* 552 F.2d 1330, 1331 (9th Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978) ("Congress has already determined, and the courts have accepted as rational, that drug trafficking affects interstate commerce."); *see also United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990), *cert. denied,* 502 U.S. 969, 112 S.Ct. 442, 116 L.Ed.2d 460 (1991) (same).

Accordingly, the court finds that the factors present in *Lopez* are absent here. The

---

**10.** As the charges under 16 U.S.C. §§ 1372 and 1375, the Marine Mammal Protection Act, have been dismissed, the court will not address this statute.

court therefore DENIES the motion to dismiss the indictments as to charges brought under 21 U.S.C. §§ 842(a)(1) and 844.[11]

## C. *16 U.S.C. §§ 668(a), 703, 707(a)* [12]

As part of the Migratory Bird Treaty Act, section 703 makes illegal the taking, killing, or possessing of migratory birds, or any part thereto. 16 U.S.C. § 703. Section 707(a) provides the penalty for violation of this act. *See* 16 U.S.C. § 707(a). Section 668(a) makes it illegal to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" any bald eagle or golden eagle or any part thereof. 16 U.S.C. § 668(a).

The Supreme Court found that section 703 meets the requirements of regulation under the Commerce Clause, in *State of Missouri v. Holland.* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The Court reasoned that migratory birds are only temporarily within the boundaries of any one state, and therefore the welfare of these birds could only be protected by a "national action." *Id.* at 434, 40 S.Ct. at 383–84.

*Holland* clearly defeats Defendant's argument that section 703 violates the commerce clause. Inasmuch as section 707(a) provides the remedy for violation of section 703, it too is valid under the commerce clause. Although the holding in *Holland* did not apply to section 668(a), the same reasoning applies to this section. Bald and golden eagles do not confine themselves to fly only within the borders of one state. As the Court stated in *Holland,* they too may be "birds that yesterday had not arrived, and tomorrow may be in another state." *Holland,* 252 U.S. at 434, 40 S.Ct. at 384. Therefore this court extends the reasoning in *Holland* to 16 U.S.C. § 668(a) and finds that this section may also be regulated by Congress under the Commerce Clause. Accordingly, Defendant's Motion is DENIED with respect to this section.

## D. *18 U.S.C. §§ 922(g)(1) and 922(g)(3)*

Section 922(g) provides, in pertinent part:

It shall be unlawful for any person—

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

\* \* \* \* \* \*

(3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)); to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g). By its very terms, Section 922(g) contains a jurisdictional element requiring that the possession affects or has a link with interstate commerce.

The "affecting commerce" element can be satisfied if the firearm possessed by a convicted felon had previously traveled in interstate commerce. *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 523–24, 30 L.Ed.2d 488 (1971). It is not necessary for the government to prove that the felon crossed state lines with the firearm. *Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977) (holding that Congress did not intend to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce). "It is the movement of the firearm which has the affect upon interstate commerce, and not the activity of the person in whose possession it is later found." *United States v. Bumphus,* 508 F.2d 1405, 1407 (10th Cir.1975). The relationship between possession of a firearm and interstate commerce can also be proven if the gun was manufactured in another state. *United States v. Johnson,* 722 F.2d 407, 410 (8th Cir.1983) (quoting *United States v. Perkins,* 633 F.2d 856, 859 (8th Cir.1981)).

---

**11.** The court notes that in *United States v. Gomes,* CR. 95–00161–01 ACK (D.Haw.1995), Chief Judge Kay denied Mr. Aluli's identical motion to dismiss indictment on the basis of this statute.

**12.** Bramble has miscited the statue under which he was indicted. Bramble cites to § 668(d), a non-existent section, when in fact, the correct cite is § 668(a).

The Ninth Circuit has already rejected a Lopez-based Commerce Clause challenge to a prosecution under 922(g)(1). *See United States v. Hanna,* 55 F.3d 1456 (9th Cir.1995). The Ninth Circuit noted that prior to *Lopez,* § 922(g) had been upheld because the statute explicitly requires a nexus to interstate or foreign commerce. *Id.* at 1461–62. The court held that *Lopez* could not change the conclusion that "Section 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause." *Id.* 922(g) contains a single jurisdictional provision that is applicable to both 922(g)(1) and 922(g)(3). 18 U.S.C. § 922.

It is clear that Bramble's firearm must, at some time, have been transported in interstate commerce in order for that firearm to have been found in Hawaii. Because 18 U.S.C. § 922(g) specifically requires a jurisdictional nexus between possession of a firearm and commerce, this court finds that Congress' regulation of felons in possession of firearms under Section 922(g) is a valid exercise of power under the Commerce Clause. Accordingly, the court finds the arguments raised by the defendant are without merit and this court DENIES Defendant's Motion with respect to these sections.

### CONCLUSION

For the reasons stated above, the court DENIES Defendant's Motion to Suppress Evidence and DENIES Defendant's Motion to Dismiss Indictment.

IT IS SO ORDERED.