**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald BRAMBLE, Defendant–Appellant.**

No. 95–10525.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1996.

Decided Dec. 27, 1996.

As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc Feb. 14, 1997.

Hayden Aluli, Honolulu, Hawaii, for defendant-appellant.

Mark E. Recktenwald, Assistant United States Attorney, Honolulu, Hawaii, for plaintiff-appellee.

Before: WALLACE, SCHROEDER, and ALARCON, Circuit Judges.

SCHROEDER, Circuit Judge.

Ronald Bramble appeals his convictions of possession of a firearm by a felon, 18 U.S.C. § 922(g)(1); possession of marijuana, 21 U.S.C. § 844(a); cultivation of marijuana, 21 U.S.C. § 841(a); possession of eagle feathers, 16 U.S.C. § 668(a); and possession of migratory birds, 16 U.S.C. §§ 703, 707(a). Bramble moved to suppress all evidence and

to dismiss the indictment. The district court denied both motions. *United States v. Bramble,* 894 F.Supp. 1384 (D.Haw.1995).

On appeal, Bramble contends that the warrantless search of his house was unlawful; that the district court committed error during his suppression hearing; and that all of the statutes under which he was convicted are beyond Congress' authority under the Commerce Clause. We affirm.

## Background

The facts are fully set forth in the district court's opinion. *Bramble,* 894 F.Supp. at 1387–89. We briefly summarize them here.

Bramble advertised sea otter pelts for sale.[1] Federal agents Carroll Cox and Tommy Friel, acting undercover, responded to the ad. Bramble told the agents to come to his home, and invited them in to negotiate the sale. During the discussions, Bramble accused the undercover agents of being police officers. The agents denied being police officers and threatened to take their money and leave. Bramble then resumed negotiations and an agreement was reached. Bramble also showed the agents parts of a bald eagle, a golden eagle, a red-tailed hawk, and a great horned owl, all of which are unlawful to possess.[2] Agent Friel also noticed what appeared to be a vial of cocaine on the dining room table.

After seeing the illegal bird parts, Agents Cox and Friel identified themselves. They told Bramble they were not going to arrest him, but they were going to seize the wildlife items and refer the matter to the U.S. Attorney's office. The agents then called for backup from a uniformed state conservation officer waiting outside and from local police. At the invitation of the federal agents but without Bramble's consent, Officer James Weller, of the Hawaii Department of Land and Natural Resources, and Officer Robert Almeida, of the Hawaii County Police, entered the house. All initially stayed in the

dining area where the undercover agents' negotiations with Bramble had taken place.

Agent Cox gave Bramble a property receipt for the seized wildlife parts, read him his *Miranda* rights and obtained a written waiver, and questioned Bramble concerning the wildlife violations. Agent Friel told Officer Almeida about the vial and asked Almeida to handle the drug aspect of the investigation. After Agent Cox finished questioning Bramble, which took approximately half an hour, Officer Almeida asked Bramble to consent to a search of the house. Almeida explained that if Bramble did not consent, he would get a warrant. Bramble asked how long getting a warrant would take, and was told "at least a couple of hours." Bramble expressed concern that having to wait that long would interfere with caring for his dogs, and signed a consent form authorizing an unrestricted search of his house. The search turned up marijuana and marijuana plants; a strainer, two scales, and a baggie that all had cocaine residue, and two loaded firearms. Because Bramble had prior felony convictions, he was prohibited from possessing firearms. 18 U.S.C. § 922(g)(1).

A jury acquitted Bramble on a cocaine charge but convicted him of the firearm, marijuana, and eagle feather charges. The migratory bird charges were misdemeanors, on which Bramble was convicted by the court.

## I. Search and Seizure

Bramble argues the search of his home was unlawful for three reasons. First, he contends that his consent to the undercover agents' entry into his home was vitiated when, in response to Bramble's direct question, they denied that they were police officers. Second, he argues that the warrantless entry of additional uniformed officers was unlawful, and therefore invalidated his subsequent consent to search. Finally, he argues that his consent was involuntarily given be-

---

1. The sale of sea otter pelts violates the Marine Mammal Protection Act, 16 U.S.C. §§ 1372(a)(4) and 1375(b). Bramble's pelts later turned out to be river otter pelts, the possession and sale of which is legal, and the Marine Mammal Protection Act count was dropped.

2. Possession of eagle parts is prohibited by the Eagle Protection Act, 16 U.S.C. § 668(a). Possession of the hawk and owl parts is prohibited by the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 & 707(a).

cause Officer Almeida told him if he withheld consent Almeida would get a warrant. We agree with the district court's reasoning rejecting each of these contentions. *See Bramble,* 894 F.Supp. at 1391–94.

■ It is well-settled that undercover agents may misrepresent their identity to obtain consent to entry. *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427–28, 17 L.Ed.2d 312 (1966); *United States v. Bosse,* 898 F.2d 113, 115 (9th Cir.1990); *United States v. Glassel,* 488 F.2d 143, 145 (9th Cir.1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). Bramble concedes as much, but argues that although agents may initially misrepresent their identity, they may not flatly deny they are police officers when directly confronted. This contention is wholly inconsistent with the plain holding of *Lewis.* A direct denial that an agent is a police officer is no more a misrepresentation than the agent's declaring he is someone who he is not. *See Lewis,* 385 U.S. at 207, 87 S.Ct. at 425 (federal agent falsely identified himself as "Jimmy the Pollack").

In essence, Bramble argues that when inviting strangers into his home to engage in illegal activity, he may condition his consent to entry on the strangers' not being law enforcement officers. As the Supreme Court pointed out in *Lewis,* adoption of such a rule would mean the end of undercover work. If undercover agents, when asked if they were police officers, were required to answer truthfully, their lives would be placed in danger. If a lie in response to such a question made all evidence gathered thereafter the inadmissible fruit of an unlawful entry, all dealers in contraband could insulate themselves from investigation merely by asking every person they contacted in their business to deny that he or she was a law enforcement agent. This is not the law. *Lewis,* 385 U.S. at 210 & n. 6, 87 S.Ct. at 427 & n. 6.

Moreover, this is not a situation where the agents misrepresented the "scope, nature or purpose of a government investigation," *United States v. Garcia,* 997 F.2d 1273, 1280 (9th Cir.1993) (quoting *Bosse,* 898 F.2d at 115), or conducted a search that went beyond the scope of Bramble's consent to entry. *See Lewis,* 385 U.S. at 209, 87 S.Ct. at 426–27

(citing *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921)). Until Bramble showed them the incriminating bird parts, the federal undercover agents remained in the area where Bramble had invited them and acted only for the purpose for which they had been invited, *i.e.,* to conduct an illegal transaction. After identifying themselves, they did not leave the area into which they had been invited or conduct any search until Bramble had given his consent for them to do so.

■ The warrantless entry of the uniformed officers also did not invalidate Bramble's later consent to search. Although "[a]n illegal entry into a residence generally invalidates a subsequent consent search," *Bramble,* 894 F.Supp. at 1393 (citing *United States v. Howard,* 828 F.2d 552 (9th Cir.1987)), the entry of the additional officers here was not unlawful. We join the Seventh Circuit in holding that where an undercover agent is invited into a home, establishes the existence of probable cause to arrest or search, and immediately summons help from other officers, the warrantless entry of the other officers does not violate the Fourth Amendment. *See United States v. Akinsanya,* 53 F.3d 852, 856 (7th Cir.1995); *United States v. Jachimko,* 19 F.3d 296, 298–99 (7th Cir.1994). As we explained in *United States v. Rubio,* 727 F.2d 786 (9th Cir.1983):

> Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy, and, in the instant case, any remaining expectation of privacy was outweighed by the legitimate concern for the safety of [the officers inside]. *Id.* at 797, *quoted in Bramble,* 894 F.Supp. at 1393.

■ When entering pursuant to the suspect's "consent once removed," *Akinsanya,* 53 F.3d at 856; *Jachimko,* 19 F.3d at 299, the additional backup officers are restricted to the scope of the consent originally given. Our holding does not authorize police to go beyond those areas consented to or to conduct general searches without first satisfying

the ordinary requirements of consent, a warrant, or exigent circumstances which excuse the failure to obtain a warrant. *See Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970); *see also Lewis,* 385 U.S. at 211, 87 S.Ct. at 427 (although invited in, agents may not conduct a general search for incriminating materials); *Garcia,* 997 F.2d at 1280 (same). Here, the scope of the original consent was not exceeded. Agents Cox and Friel were originally invited into the kitchen and living/dining room areas of Bramble's home to conduct a transaction in protected wildlife parts. When called in as backup, Officers Weller and Almeida remained in the same area of Bramble's home, and conducted no search until after Bramble had consented to one. The additional officers' limited entry into the area into which the undercover agents had already been invited did not violate the Fourth Amendment.

Finally, for the reasons stated by the district court, we agree that Bramble's consent to the search of his home was voluntary. *See Bramble,* 894 F.Supp. at 1391–92 (considering five factors identified in *United States v. Kim,* 25 F.3d 1426, 1432 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994)); *see also United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir. 1988).

## II. The Suppression Hearing

At the suppression hearing, the government provided the defense with a redacted copy of Agent Cox's report, and the defense sought to impeach Cox at the hearing with the information contained in his report. Bramble alleges two errors concerning the report: that his rights under the Jencks Act, 18 U.S.C. § 3500, were violated by the district court's refusal to compel the production of an unredacted copy, and that the district court erred in refusing to admit the report as substantive evidence. Neither argument has merit.

■ The district court did not err in refusing to compel production of the unredacted report. Bramble argues that under the Jencks Act the court was obligated to inspect the unredacted version in camera to determine whether the redacted portions were relevant and required to be disclosed. The record reflects the court did precisely that, and determined that the redacted materials were not relevant and were not required to be disclosed. The district court did everything with respect to disclosure that Bramble claims it was required to do. We have reviewed the unredacted report, and conclude that the district court correctly held that the redacted portions of the report were irrelevant to Bramble's case.

■ Nor did the district court err in refusing to admit Agent Cox's report as substantive evidence. The court correctly allowed Bramble to attempt to impeach Cox by cross-examining him at length about the report, and also gave the defense an opportunity to introduce the document into evidence by calling Agent Cox as its own witness. Bramble did not avail himself of this opportunity. Moreover, Bramble suffered no prejudice from the exclusion; the district court indicated that it was "well aware of what the document says and I will take [it] into consideration." Because the suppression decision was made by the judge alone and the judge considered the report that was offered, Bramble suffered no violation of his substantial rights. *See* Fed.R.Crim.P. 52(a).

## III. The Commerce Clause

Relying on *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Bramble challenges each of the statutes under which he was convicted as beyond Congress' power to regulate interstate commerce.

### A. Controlled Substances Act

The district court correctly held that the Controlled Substances Act, 21 U.S.C. §§ 841(a), 844(a), is constitutional under the Commerce Clause. *Bramble,* 894 F.Supp. at 1395–96. We have so held. *United States v. Tisor,* 96 F.3d 370, 375 (9th Cir.1996); *Unit-*

ed *States v. Kim,* 94 F.3d 1247, 1249–50 (9th Cir.1996).

### B. Felon in Possession of a Firearm

The district court correctly upheld the felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1). *Bramble,* 894 F.Supp. at 1396–97. We have reached the same result. *United States v. Hanna,* 55 F.3d 1456, 1461–62 (9th Cir.1995).

### C. Migratory Bird Treaty Act

■ The district court misspoke when it said the Supreme Court upheld the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 707(a), under the Commerce Clause. In *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), the Supreme Court upheld the Act not under the Commerce Clause, but under the Article I, Section 8 Necessary and Proper Clause and the Article II treaty-making power. *Id.* at 432, 40 S.Ct. at 383. The Court emphasized that treaties made by the United States are the supreme law of the land under Article VI, and that "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, Section 8, as a necessary and proper means to execute the powers of the Government." *Id.* The Court went on to uphold the treaty, and consequently the statute, as a necessary measure to protect migratory birds from extinction, "a national interest of very nearly the first magnitude ..., [which] can be protected only by national action in concert with that of another power." *Id.* at 435, 40 S.Ct. at 384. The Court observed that

> [b]ut for the treaty and the statute there soon might be no birds for any powers to deal with. We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed. It is not sufficient to rely upon the States. The reliance is vain, and were it otherwise, the question is whether the United States is forbidden to act. We are of the opinion that the treaty and statute must be upheld.

*Id.*

Because the Supreme Court has held that the Migratory Bird Treaty Act is constitu-

tional as a necessary and proper means of carrying out the treaty-making power, we need not consider whether it is a constitutional exercise of the Commerce Clause power as well.

### D. Eagle Protection Act

■ The district court upheld the Eagle Protection Act, 16 U.S.C. § 668, as a valid exercise of the Commerce Clause power under the reasoning of *Missouri v. Holland, supra. Bramble,* 894 F.Supp. at 1396. As we have discussed, *Holland* was a treaty power and not a Commerce Clause case. Nonetheless, we conclude that the Act is constitutional under the Commerce Clause.

Both the Supreme Court and this court have, prior to *Lopez,* concluded that congressional efforts at protecting endangered and migratory species are constitutional under the Commerce Clause. *See Andrus v. Allard,* 444 U.S. 51, 63 n. 19, 100 S.Ct. 318, 325 n. 19, 62 L.Ed.2d 210 (1979) (discussing Eagle Protection Act and Migratory Bird Treaty Act and noting that the "assumption that the national commerce power does not reach migratory wildlife is clearly flawed"); *Leslie Salt Co. v. United States,* 896 F.2d 354, 360 (9th Cir.1990) ("*Leslie I* ") ("The commerce clause power ... is broad enough to extend [federal] jurisdiction to local waters which may provide habitat to migratory birds and endangered species."), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991); *id.* at 361 n. 1 (Rymer, J., concurring) ("Congress does have power under the Commerce Clause to regulate wildlife and endangered species."); *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1396 (9th Cir.) (noting "broad sweep of the Commerce Clause" and declining to reconsider *Leslie I* ), *cert. denied,* —— U.S. ——, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995); *see also Hughes v. Oklahoma,* 441 U.S. 322, 329–36, 99 S.Ct. 1727, 1732–36, 60 L.Ed.2d 250 (1979) (holding that state regulations of intrastate wildlife are within dormant Commerce Clause).

Bramble contends that in light of *Lopez,* the Act cannot stand because it has nothing to do with commerce or any economic enter-

prise that substantially affects commerce. This is not a correct assertion.

 Laws governing intrastate activities will be upheld if they regulate a class of activity which substantially affects interstate commerce. *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1629–30; *Perez v. United States,* 402 U.S. 146, 152–54, 91 S.Ct. 1357, 1360–61, 28 L.Ed.2d 686 (1971). Regulations of commercial activities are presumed to have the requisite interstate nexus, "on the assumption that we have a single market and a unified purpose to build a stable national economy." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1637 (Kennedy, J., concurring).

The Bald Eagle Protection Act, amended in 1962 to include golden eagles, was passed to protect eagles from extinction. Bald Eagle Protection Act, ch. 278, § 1, 54 Stat. 250 (1940) (codified as amended at 16 U.S.C. §§ 668–668d (1994)). To serve that end, the Act prohibits all traffic in eagles or eagle parts. 16 U.S.C. § 668(a) (prohibiting the taking, possession, sale, purchase, barter, offering to sell, purchase or barter, transportation, exportation or importation of bald or golden eagles or their parts).

The Act forbids not only commerce or attempted commerce in eagle parts, but also simple possession of them. *Id.* Both commerce in and possession of eagle parts, each taken as a class, have substantial effects on interstate commerce, because both activities, even when conducted purely intrastate, threaten the eagle with extinction. *See Allard,* 444 U.S. at 58, 100 S.Ct. at 323 ("It was reasonable for Congress to conclude that the possibility of commercial gain presents a special threat to the preservation of the eagles because that prospect creates a powerful incentive both to evade statutory prohibitions against taking birds and to take a large volume of birds."); *United States v. Lundquist,* 932 F.Supp. 1237, 1244 (D.Or.1996) ("The [Act] prohibits a class of activities, *e.g.,* sale, purchase, or possession, and is aimed at controlling the interstate market for eagle feathers and parts by creating criminal liability for those who create the demand for them."); H.R.Rep. No. 1450, 87th Cong., 2d

Sess. 2 (1962) ["House Report"] (noting the threat to the golden eagle posed by demand for eagle feathers as religious artifacts and tourist souvenirs), *quoted in United States v. Dion,* 476 U.S. 734, 742, 106 S.Ct. 2216, 2222, 90 L.Ed.2d 767 (1986); *cf.* 21 U.S.C. § 801 (finding that to effectively control interstate traffic in illegal drugs it is necessary to control intrastate possession of and traffic in those substances).

Extinction of the eagle would substantially affect interstate commerce by foreclosing any possibility of several types of commercial activity: future commerce in eagles or their parts; future interstate travel for the purpose of observing or studying eagles; or future commerce in beneficial products derived either from eagles or from analysis of their genetic material. As the court explained in *Palila v. Hawaii Dep't of Land & Natural Resources,* 471 F.Supp. 985 (D.Haw. 1979), *aff'd,* 639 F.2d 495 (9th Cir.1981), in a passage we have previously cited with approval: [3]

> [A] national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species, that would otherwise be lost by state inaction.

*Id.* at 995; *see also Douglas v. Seacoast Products,* 431 U.S. 265, 282, 97 S.Ct. 1740, 1750, 52 L.Ed.2d 304 (1977) (federal regulation of taking of fish in state waters was valid under Commerce Clause; "[t]he movement of vessels from one State to another in search of fish ... is certainly activity which Congress could conclude affects interstate commerce"); *Utah v. Marsh,* 740 F.2d 799, 803–04 (10th Cir.1984) (holding interstate movement of travelers "to observe, photograph, and appreciate a variety of bird and animal life" sufficient to bring federal regulations within ambit of Commerce Clause).

The only two courts to confront post-*Lopez* Commerce Clause challenges to federal wild-

3. *See Leslie I,* 896 F.2d at 360, *and Leslie II,* 55 F.3d at 1396; *see also Hoffman Homes v. Administrator, U.S. E.P.A.,* 999 F.2d 256, 261 (7th Cir. 1993) (adopting *Palila* rationale).

life protection laws have reached similar conclusions, and we agree with those courts. *See Lundquist,* 932 F.Supp. at 1244–45 (upholding Eagle Protection Act); *United States v. Romano,* 929 F.Supp. 502, 507–09 (D.Mass. 1996) (upholding the Lacey Act[4]). In *Romano,* the court relied on Congress' own explanation of the commercial value of preserving Earth's biodiversity:

> From a pragmatic point of view, the protection of an endangered species of wildlife with some commercial value may permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels in a very brief span of time. Potentially more important, however, is the fact that with each species we eliminate, we reduce the [genetic] pool ... available for use by man in future years. Since each living species and subspecies has developed in a unique way to adapt itself to the difficulty of living in the world's environment, as a species is lost, its distinctive gene material, which may subsequently prove invaluable to mankind in improving domestic animals or increasing resistance to disease or environmental contaminants, is also irretrievably lost.

S.Rep. No. 526, 91st Cong., 1st Sess. (1969), *reprinted in* 1969 U.S.C.C.A.N. 1413, 1415, *and quoted in Romano,* 929 F.Supp. at 508. The Supreme Court has also recognized Congress' concern "about the unknown uses that endangered species might have and about the unforeseeable place such creatures may have in the chain of life on this planet." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 178–79, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). In *TVA,* the Court emphasized portions of the legislative history of the Endangered Species Act:

> [T]he value of [endangered species'] genetic heritage is, quite literally, incalculable.

> . . . .

From the most narrow possible point of view, *it is in the best interests of mankind to minimize the losses of genetic variations.* The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.

H.R.Rep. No. 412, 93d Cong., 1st Sess., at 4–5 (1973), *quoted with emphasis in TVA,* 437 U.S. at 178, 98 S.Ct. at 2293–94.

Congress thus had a rational basis on which to conclude that the extinction of the eagle would have a substantial effect on interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (reaffirming rational basis test); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 277, 281, 101 S.Ct. 2352, 2360, 2363, 69 L.Ed.2d 1 (1981). Congress' belief that the means it chose were necessary to preserve the eagles from extinction was also rational. *Allard,* 444 U.S. at 58, 100 S.Ct. at 323.

The Eagle Protection Act is constitutional under the Commerce Clause.

AFFIRMED.

---

**4.** The Lacey Act, codified as amended at 16 U.S.C. §§ 3371–3378, prohibits traffic in wildlife taken, possessed, transported or sold in violation of any federal, state, or foreign law.