**Angel McClary RAICH; Diane Monson; John Doe, Number One; John Doe, Number Two, Plaintiffs–Appellants,**

v.

**John ASHCROFT, Attorney General, as United States Attorney General; Asa Hutchinson, as Administrator of the Drug Enforcement Administration, Defendants–Appellees.**

No. 03–15481.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 2003.

Filed Dec. 16, 2003.

Robert A. Raich, Oakland, CA, David M. Michael, San Francisco, CA, Randy Barnett, Boston, MA, for Plaintiffs–Appellants.

Mark T. Quinlivan, U.S. Department of Justice, Washington, D.C., for Defendants–Appellees.

Alice P. Mead, San Francisco, CA, Julie M. Carpenter and David A. Handzo, Jenner & Block, Washington, DC, for Amici California Medical Association and California Nurses Association.

Bill Lockyer, Attorney General and Taylor S. Carey, Special Assistant Attorney General, Sacramento, CA, for Amicus State of California.

Richard E. Winnie, County Counsel, Oakland, CA, for Amicus County of Alameda.

John A. Russo, City Attorney and Barbara J. Parker, Chief Assistant City Attorney, Oakland, CA, for Amicus City of Oakland.

Michael L. Ramsey, District Attorney, Oroville, CA, for Amicus County of Butte.

Frederick L. Goss, Oakland, CA, for Amici Marijuana Policy Project, Rick Doblin, Ph.D. and Ethan Russo, M.D.

Before: PREGERSON, BEAM,* and PAEZ, Circuit Judges.

* The Honorable C. Arlen Beam, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

PREGERSON, Circuit Judge:

Two of the appellants, Angel McClary Raich and Diane Monson, are seriously ill Californians who use marijuana for medical purposes on the recommendation of their doctors. Such use is legal under California's Compassionate Use Act. Monson grows her own medical marijuana. The remaining two appellants, John Doe Number One and John Doe Number Two, assist Raich in growing her marijuana. On October 9, 2002, the appellants filed suit against John Ashcroft, the Attorney General of the United States, and Asa Hutchinson, the Administrator of the Drug Enforcement Administration, seeking injunctive and declaratory relief based on the alleged unconstitutionality of the federal Controlled Substances Act. The appellants also seek a declaration that the medical necessity defense precludes enforcement of that act against them.

On March 5, 2003, the district court denied the appellants' motion for a preliminary injunction because the appellants had not established a sufficient likelihood of success on the merits. That ruling is now before us.

## FACTUAL AND PROCEDURAL HISTORY

A. *Statutory Scheme*

1. *The Controlled Substances Act*

Congress enacted the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, ("CSA") as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1236. The CSA establishes five "schedules" of certain drugs and other substances and designates these items "controlled substances." 21 U.S.C. §§ 802(6), 812(a). Marijuana is a schedule I controlled substance. *Id.* § 812(c). For a drug or other substance to be designated a schedule I controlled

substance, it must be found (1) that the substance "has a high potential for abuse"; (2) that the substance "has no currently accepted medical use in treatment in the United States"; and (3) that there is "a lack of accepted safety for use of the drug or other substance under medical supervision." *Id.* at § 812(b)(1). The CSA sets forth procedures by which the schedules may be modified. *Id.* at § 811(a).

Among other things, the CSA makes it unlawful to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," except as provided for in the statute. 21 U.S.C. § 841(a)(1). Possession of a controlled substance, except as authorized under the CSA, is also unlawful. *Id.* § 844(a).

Congress set forth certain findings and declarations in the CSA, the most relevant of which are as follows:

(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

. . . .

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, is it not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

(6) Federal control of the intrastate incidents of the traffic in controlled sub-

stances is essential to the effective control of the interstate incidents of such traffic.

21 U.S.C. § 801.

### 2. California's Compassionate Use Act of 1996

In 1996, California voters passed Proposition 215, which is codified as the Compassionate Use Act of 1996 ("Compassionate Use Act"), Cal. Health & Safety Code § 11362.5. Among other purposes, the Compassionate Use Act is intended

[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

Id. § 11362.5(b)(1)(A). The Compassionate Use Act is also intended "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction." Id. § 11362.5(b)(1)(B). To these ends, the Compassionate Use Act exempts "a patient, or [ ] a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician" from certain other California code sections that make possession or cultivation of marijuana illegal. Id. § 11362.5(d).

### B. Factual Background

Appellants Angel McClary Raich and Diane Monson (the "patient-appellants") are California citizens who currently use marijuana as a medical treatment. Appellant Raich has been diagnosed with more than ten serious medical conditions, including an inoperable brain tumor, life-threatening weight loss, a seizure disorder, nausea, and several chronic pain disorders. Appellant Monson suffers from severe chronic back pain and constant, painful muscle spasms. Her doctor states that these symptoms are caused by a degenerative disease of the spine.

Raich has been using marijuana as a medication for over five years, every two waking hours of every day. Her doctor contends that Raich has tried essentially all other legal alternatives and all are either ineffective or result in intolerable side effects; her doctor has provided a list of thirty-five medications that fall into the latter category alone. Raich's doctor states that foregoing marijuana treatment may be fatal. Monson has been using marijuana as a medication since 1999. Monson's doctor also contends that alternative medications have been tried and are either ineffective or produce intolerable side effects. As the district court put it: "Traditional medicine has utterly failed these women...."

Appellant Monson cultivates her own marijuana. Raich is unable to cultivate her own. Instead, her two caregivers, appellants John Doe Number One and John Doe Number Two, grow it for her. These caregivers provide Raich with her marijuana free of charge. They have sued anonymously in order to protect Raich's supply of medical marijuana. In growing marijuana for Raich, they allegedly use only soil, water, nutrients, growing equipment, supplies and lumber originating from or manufactured within California. Although these caregivers cultivate marijuana for Raich, she processes some of the marijuana into cannabis oils, balm, and foods.

On August 15, 2002, deputies from the Butte County Sheriff's Department and agents from the Drug Enforcement Agen-

cy ("DEA") came to Monson's home. The sheriff's deputies concluded that Monson's use of marijuana was legal under the Compassionate Use Act. However, after a three-hour standoff involving the Butte County District Attorney and the United States Attorney for the Eastern District of California, the DEA agents seized and destroyed Monson's six cannabis plants.

## C. *Procedural History*

Fearing raids in the future and the prospect of being deprived of medicinal marijuana, the appellants sued the United States Attorney General John Ashcroft and the Administrator of the DEA Asa Hutchison on October 9, 2002. Their suit seeks declaratory relief and preliminary and permanent injunctive relief. They seek a declaration that the CSA is unconstitutional to the extent it purports to prevent them from possessing, obtaining, manufacturing, or providing cannabis for medical use. The appellants also seek a declaration that the doctrine of medical necessity precludes enforcement of the CSA to prevent Raich and Monson from possessing, obtaining, or manufacturing cannabis for their personal medical use.

On March 5, 2003, the district court denied the appellants' motion for a preliminary injunction. The district court found that, "despite the gravity of plaintiffs' need for medical cannabis, and despite the concrete interest of California to provide it for individuals like them," the appellants had not established the required " 'irreducible minimum' of a likelihood of success on the merits under the law of this Circuit...." The appellants filed a timely notice of appeal on March 12, 2003. We have jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).[1]

## STANDARD OF REVIEW

■ A district court's order regarding preliminary injunctive relief is subject to limited review. *United States v. Peninsula Communications, Inc.*, 287 F.3d 832, 839 (9th Cir.2002). The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Id.* The legal premises underlying a preliminary injunction are reviewed *de novo. See A & M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir.2002); *Foti v. City of Menlo Park*, 146 F.3d 629, 634–35 (9th Cir.1998) ("Although we review a district court's decision to deny a motion for a preliminary injunction for an abuse of discretion, we review the legal issues underlying the district

---

**1.** As a threshold matter, the dissent questions the justiciability of this case. The dissent states that the plaintiffs "allege three instances of injury in their prayer for relief" and believes that two of these "injuries" are not ripe for review. The dissent essentially concedes, however, that based on the threat of future seizure of their plants, the plaintiffs have standing and their claims are ripe. This is all that is required for the plaintiffs to challenge the constitutionality of the CSA as applied to them. Once the plaintiffs have established standing on their claim that challenges the constitutionality of the CSA as applied to them, they are entitled to any appropriate *remedies* that necessarily follow from demonstrating the likelihood of success on that claim of unconstitutionality. The remedies sought are not properly understood as separate "injuries." All of the relief sought by the plaintiffs necessarily follows from the claim—the challenge to the constitutionality of the CSA as-applied—for which they undisputedly have standing and which is clearly ripe. This result is completely consistent with the case or controversy requirement of Article III. *See California Pro–Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n. 2 (9th Cir. 2003) (noting that, whether characterized as a question of standing or ripeness, "we ask whether there exists a constitutional case or controversy and whether the issues presented are definite and concrete, not hypothetical and abstract." (quotation marks omitted)).

court's decision de novo." (citations omitted)).

## ANALYSIS

■ The traditional test for granting preliminary injunctive relief requires the applicant to demonstrate: (1) a likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of hardships favors the applicant; and (4) whether any public interest favors granting an injunction. *See Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,* 774 F.2d 1371, 1374 (9th Cir.1985); *see also* SCHWARZER, TASHIMA & WAGSTAFFE, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL, ¶ 13:44 at 13–15 (The Rutter Group 2003).

■ Our court also uses an alternative test that requires the applicant to demonstrate either: a combination of probable success on the merits and the possibility of irreparable injury; or serious questions going to the merits and that the balance of hardships tips sharply in the applicant's favor. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987). These two tests are not inconsistent. Rather, they represent a continuum of equitable discretion, whereby "the greater the relative hardship to the moving party, the less probability of success must be shown." *Nat'l Ctr. for Immigrants Rights, Inc. v. INS,* 743 F.2d 1365, 1369 (9th Cir.1984).

### A. *The Merits of the Appellants' Case*

■ Congress passed the CSA based on its authority under the Commerce Clause of the Constitution. The Commerce Clause grants Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3. The appellants argue that the Commerce Clause cannot support the exercise of federal authority over the appellants' activities. The Supreme Court expressly reserved this issue in its recent decision, *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494 n. 7, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) ("Nor are we passing today on a constitutional question, such as whether the Controlled Substances Act exceeds Congress' power under the Commerce Clause."). We find that the appellants have demonstrated a strong likelihood of success on their claim that, as applied to them, the CSA is an unconstitutional exercise of Congress' Commerce Clause authority. We decline to reach the appellants' other arguments, which are based on the principles of federalism embodied in the Tenth Amendment, the appellants' alleged fundamental rights under the Fifth and Ninth Amendments, and the doctrine of medical necessity.

### 1. *Defining the Class of Activities*

The district court found that the Commerce Clause supports the application of the CSA to the appellants. Indeed, we have upheld the CSA in the face of past Commerce Clause challenges. *See United States v. Bramble,* 103 F.3d 1475, 1479–80 (9th Cir.1996); *United States v. Tisor,* 96 F.3d 370, 375 (9th Cir.1996); *United States v. Kim,* 94 F.3d 1247, 1249–50 (9th Cir. 1996); *United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990); *United States v. Montes–Zarate,* 552 F.2d 1330, 1331 (9th Cir.1977); *United States v. Rodriquez–Camacho,* 468 F.2d 1220, 1222 (9th Cir.1972). But none of the cases in which the Ninth Circuit has upheld the CSA on Commerce Clause grounds involved the use, possession, or cultivation of marijuana for medical purposes.

In arguing that these cases should govern here and should foreclose the appellants' Commerce Clause challenge, the appellees correctly note that " 'where *a general regulatory statute bears a sub-*

stantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (first emphasis added in *Lopez* )). In *Visman*, we upheld the CSA on Commerce Clause grounds and restated this principle: "'Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'" 919 F.2d at 1393 (quoting *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)) (emphasis by *Visman;* quotation marks omitted).[2]

But here the appellants are not only claiming that their activities do not have the same effect on interstate commerce as activities in other cases where the CSA has been upheld. Rather, they contend that, whereas the earlier cases concerned drug *trafficking*, the appellants' conduct constitutes a *separate and distinct class of activities:* the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to valid California state law.

Clearly, the way in which the activity or class of activities is defined is critical. We find that the appellants' class of activities—the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician—is, in fact, different in kind from drug trafficking. For instance, concern regarding users' health and safety is significantly different in the medicinal marijuana context, where the use is pursuant to a physician's recommendation. Further, the limited medicinal use of mari-

juana as recommended by a physician arguably does not raise the same policy concerns regarding the spread of drug abuse. Moreover, this limited use is clearly distinct from the broader illicit drug market—as well as any broader commercial market for medicinal marijuana—insofar as the medicinal marijuana at issue in this case is not intended for, nor does it enter, the stream of commerce.

A narrow categorization of the appellants' activity is supported by our recent decision in *United States v. McCoy*, 323 F.3d 1114 (9th Cir.2003). In *McCoy*, we held that 18 U.S.C. § 2252(a)(4)(B), a statute purportedly prohibiting the possession of child pornography, was unconstitutional as applied to intrastate possession of a visual depiction (or depictions) that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution, or for any economic or commercial use, including the exchange of the prohibited material for other prohibited material. *See McCoy*, 323 F.3d at 1115. *McCoy* involved a photograph taken at home of a mother and daughter with their genital areas exposed. *Id.* at 1115. The photograph never entered into and was never intended for interstate or foreign commerce. *Id.* at 1132. The dissent in *McCoy* argued that the majority had engaged in an impermissible as-applied analysis, that the activity fell within the language of the statute, and that the majority was attempting to excise a particular act as trivial. *See id.* at 1134, 1140–41 (Trott, J., dissenting). The majority held that the conduct at issue in *McCoy* represents a "substantial portion" of the conduct covered by the relevant statute and therefore can be considered a *separate class of activity.* *Id.* at 1132.

Under *McCoy*, the *class of activities* at issue in this case can properly be defined

---

**2.** *Visman* upheld the application of the CSA to the intrastate criminal cultivation of marijua-na plants found rooted in soil but intended for sale. *See* 919 F.2d at 1392–93.

as the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician and in accordance with state law. This class of activities does not involve sale, exchange, or distribution. As was the case in *McCoy*, the class of activities here represents a substantial portion of the conduct covered by the statute—at the time of the motion for a preliminary injunction, Alaska, Arizona, California, Colorado, Hawaii, Maine, Nevada, Oregon, and Washington had passed laws permitting cultivation and use of marijuana for medical purposes. *See McCoy*, 323 F.3d at 1132 ("This class of activity represents a substantial portion of the conduct covered by [the statute].").

### 2. *Substantial Effect on Interstate Commerce*

We must now answer the question whether this class of activities has an effect on interstate commerce sufficient to make it subject to federal regulation under the Commerce Clause. *See Visman*, 919 F.2d at 1392 ("In *Perez* ... the Court ruled that the defendants' local, illegal activity of loan sharking was within a 'class of activity' that adversely affected interstate commerce and Congress had the power to regulate it."). In two recent Commerce Clause decisions, the Supreme Court has refined Commerce Clause analysis. In *Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Court struck down the Gun–Free School Zones Act of 1990 as an unconstitutional exercise of power under the Commerce Clause. *Lopez* set forth three categories of activity that Congress may properly regulate under the Commerce Clause: the "use of the channels of interstate commerce"; the "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and "those activities having a substantial relation to in-terstate commerce, *i.e.*, those activities that substantially affect interstate commerce." 514 U.S. at 558–59, 115 S.Ct. 1624 (citations omitted). This case involves the third category of activity.

■ In *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Supreme Court clarified Commerce Clause analysis under this third category. In that case, the Court held that the Violence Against Women Act was an invalid exercise of federal power under the Commerce Clause. 529 U.S. at 627, 120 S.Ct. 1740. *Morrison* established a controlling four-factor test for determining whether a regulated activity "substantially affects" interstate commerce: (1) whether the statute regulates commerce or any sort of economic enterprise; (2) whether the statute contains any "express jurisdictional element that might limit its reach to a discrete set" of cases; (3) whether the statute or its legislative history contains "express congressional findings" regarding the effects of the regulated activity upon interstate commerce; and (4) whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated." *Morrison*, 529 U.S. at 610–12, 120 S.Ct. 1740; *see also McCoy*, 323 F.3d at 1119. The first and the fourth factors are the most important. *McCoy*, 323 F.3d at 1119.

### a. *Whether the Statute Regulates Commerce or Any Sort of Economic Enterprise*

As applied to the limited class of activities presented by this case, the CSA does not regulate commerce or any sort of economic enterprise. The cultivation, possession, and use of marijuana for medicinal purposes and not for exchange or distribution is not properly characterized as commercial or economic activity. Lacking sale, exchange or distribution, the activity does not possess the essential elements of

commerce. *See* BLACK'S LAW DICTIONARY (7th ed.1999) ("commerce": "The exchange of goods and services, esp. on a large scale involving transportation between cities, states, and nations.").[3]

On this point, the instant case is again analogous to *McCoy*. The *McCoy* court concluded "that simple intrastate possession is not, by itself, either commercial or economic in nature, that a 'home-grown' picture of a child taken and maintained for personal use is not a fungible product, and that there is no economic connection—supply and demand or otherwise—between possession of such a picture and the national multi-million dollar commercial pornography industry." *Id.* at 1131.

As the photograph in *McCoy* stood in contrast to the commercial nature of the larger child pornography industry, so does the medicinal marijuana use at issue in this case stand in contrast to the larger illicit drug trafficking industry. And it is the commercial nature of drug trafficking activities that has formed the basis of prior Ninth Circuit decisions upholding the CSA on Commerce Clause grounds. *See, e.g., Tisor,* 96 F.3d at 375 ("Intrastate *distribution* and *sale* of methamphetamine are commercial activities. The challenged laws are part of a wider regulatory scheme criminalizing interstate and intrastate

commerce in drugs." (emphasis added)); *Kim,* 94 F.3d at 1250 ("After *Lopez,* we again acknowledged that *drug trafficking* affects interstate commerce." (emphasis added)).

The parties debate whether the "aggregation principle" of *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct.· 82, 87 L.Ed. 122 (1942), should be employed, presumably to support a finding that the cumulative effect of the activities in this case has a commercial impact. As the regulated activity in this case is not commercial, *Wickard*'s aggregation analysis is not applicable. *Morrison,* 529 U.S. at 611 n. 4, 120 S.Ct. 1740 ("[I]n every case where we have sustained federal regulation under the aggregation principle in *Wickard* ... the regulated activity was of an apparent commercial character."); *McCoy,* 323 F.3d at 1120 ("In *Lopez,* the court approved of *Wickard*'s rationale only in relation to activity the *economic* nature of which was obvious." (citing *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624)); *United States v. Ballinger,* 312 F.3d 1264, 1270 (11th Cir.2002) ("No such aggregation of local effects is constitutionally permissible in reviewing congressional regulation of intrastate, *noneconomic* activity.").[4]

The majority in *McCoy* went on to examine whether the possession of child por-

---

**3.** Although the Doe appellants are providing marijuana to Raich, there is no "exchange" sufficient to make such activity commercial in character. As Raich states in her declaration: "My caregivers grow my medicine specifically for me. They do not charge me, nor do we trade anything. They grow my medicine and give it to me free of charge."

**4.** The dissent relies on *Proyect v. United States,* 101 F.3d 11 (2d Cir.1996), to support the proposition that the activities at issue in this case are "essentially indistinguishable from the activity in *Wickard* ...." In this vein, the dissent argues that the appellants' marijuana "*could* be sold in the marketplace, and ... is also being used for medicinal pur-

poses in place of other drugs which would have to be purchased in the marketplace." *Proyect* is distinguishable from the instant case. Although the individual in *Proyect* argued that his activities could not be regulated under the Commerce Clause because his marijuana was allegedly for personal consumption, the case involved over 100 marijuana plants and the court found that it was "very unlikely that he personally intended to consume all of his crop...." 101 F.3d at 13. Moreover, while Proyect argued that the marijuana was only for his personal consumption, he did not allege that it was for medicinal purposes. Therefore the class of activities involved in this case is significantly different from the class of activities involved in *Proyect.*

nography at issue in that case could fit within the *Wickard* analysis, largely because a pre-*Morrison* Third Circuit decision had done just that. *See* 323 F.3d at 1121–22. The parties pick up on this discussion and debate whether, unlike the child pornography in *McCoy*, the marijuana at issue here is "fungible" such that the aggregation principle should apply. This debate is unnecessary in light of Supreme Court precedent suggesting that the aggregation principle should only be applied where the activity's commercial character is apparent. *See Morrison*, 529 U.S. at 611 n. 4, 120 S.Ct. 1740. Here it is not. Moreover, *McCoy* settled the fungibility issue less by looking at whether the item was one that could be freely exchanged or replaced (what one might consider to be the important characteristics of fungibility) and more by simply concluding that the photograph at issue in that case was "meant entirely for personal use, without . . . any intention of exchanging it for other items of child pornography, or using it for any other economic or commercial reasons. Nor is there any reason to believe that [Rhonda McCoy] had any interest in acquiring pornographic depictions of other children." 323 F.3d at 1122. Under these standards, the marijuana at issue in this case is similarly non-fungible, as its use is personal and the appellants do not seek to

exchange it or to acquire marijuana from others in a market.

Therefore, we conclude that the first *Morrison* factor favors a finding that the CSA, as applied to the facts of this case, is unconstitutional under the Commerce Clause.[5]

b. *Whether the Statute Contains Any Express Jurisdictional Element That Might Limit Its Reach*

The second factor examines whether the statute contains a "jurisdictional hook" (i.e., limitation) that would limit the reach of the statute to a discrete set of cases that substantially affect interstate commerce. *See McCoy*, 323 F.3d at 1124. No such jurisdictional hook exists in relevant portions of the CSA. *See County of Santa Cruz*, 279 F.Supp.2d at 1209. Therefore, this factor favors a finding that Congress has exceeded its powers under the Commerce Clause.

c. *Whether the Statute or Its Legislative History Contains Express Congressional Findings Regarding the Effects of the Regulated Activity Upon Interstate Commerce*

Congress clearly made certain findings in the CSA regarding the effects of intra-

---

**5.** In a recent decision, a district court reached the opposite conclusion as to this factor. The court defined the class of activities as "intrastate cultivation and possession of marijuana for medicinal purposes. . . ." *County of Santa Cruz v. Ashcroft*, 279 F.Supp.2d 1192, 1208 (N.D.Cal.2003). The court concluded that "the declarations and findings of Congress in adopting the CSA make clear that Congress considers such activity to have a substantial effect on interstate commerce because controlled substances are fungible items that influence and contribute to a national black market for controlled substances regardless of the purposes for which they are used." *Id.* at 1209. This analysis is flawed because the congressional findings relied upon do not ad-

dress the specific class of activities set forth by the court in *County of Santa Cruz. See id.* (citing 21 U.S.C. § 801(3)-(6)). Instead, they are concerned primarily with the trafficking and distribution of controlled substances. More importantly, the district court's analysis fails to ask the question set forth in the first *Morrison* factor: whether the statute, as applied to the particular class of activities, regulates commerce or an economic enterprise. The congressional findings do not address this question; at best, they address whether the activity—commercial or not—has some effect on interstate commerce. Finally, the district court in *County of Santa Cruz*, by looking solely to congressional findings, erroneously conflated the first and third factors.

state activity on interstate commerce. These findings do not specifically address the class of activities at issue here. Relevant findings include:

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, is it not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

21 U.S.C. § 801. As noted above, *supra* note 4, these findings are primarily concerned with the trafficking or distribution of controlled substances. Nevertheless, they provide some evidence that intrastate possession of controlled substances may impact interstate commerce.

Therefore, the third factor weighs in favor of finding the CSA constitutional under the Commerce Clause. But it is worth reiterating two things in this respect. First, there is no indication that Congress was considering anything like the class of activities at issue here when it made its

findings. The findings are not specific to marijuana, much less intrastate medicinal use of marijuana that is not bought or sold and the use of which is based on the recommendation of a physician. Common sense indicates that the findings related to this specific class of activities would be significantly different from the findings relating to the effect of drug trafficking, generally, on interstate commerce.[6]

Second, *Morrison* counsels courts to take congressional findings with a grain of salt.

> [T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez*, [s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Rather, [w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.

*Morrison*, 529 U.S. at 614, 120 S.Ct. 1740 (citations and quotation marks omitted). As noted above, it is not the existence of congressional findings, but rather the first and fourth factors—whether the statute regulates commerce or any sort of economic enterprise and whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated"—that are considered the most signifi-

---

**6.** We note that the majority in *McCoy* distinguished the CSA from the statute under consideration in that case on the basis of the fact that the CSA contains express legislative findings regarding the relationship between purely intrastate activities and interstate commerce. *McCoy*, 323 F.3d at 1128 n. 24. Citing to drug trafficking cases, the majority in *McCoy* wrote: "It is primarily on the basis of these congressional findings that we rejected Commerce Clause challenges to the

[CSA]." *Id.* These statements from *McCoy* are inapposite to this case for two reasons. First, as discussed above, the drug trafficking cases—for which the congressional findings may provide adequate jurisdictional support—are different in kind from the instant case. Second, the *McCoy* majority noted that *Morrison* may affect the analysis even in those cases. *Id.* ("We express no view, however, as to the effect of *Morrison* on these cases.").

cant in this analysis.[7]  *McCoy*, 323 F.3d at 1119.

### d. Whether the Link Between the Regulated Activity and a Substantial Effect on Interstate Commerce Is "Attenuated"

The final *Morrison* factor examines whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated." The connections in this case are, indeed, attenuated. Presumably, the intrastate cultivation, possession and use of medical marijuana on the recommendation of a physician could, at the margins, have an effect on interstate commerce by reducing the demand for marijuana that is trafficked interstate. It is far from clear that such an effect would be substantial. The congressional findings provide no guidance in this respect, as they do not address the activities at issue in the present case. Although not binding, other judges that have looked at the specific question presented here have found that the connection is attenuated. As one of our colleagues wrote recently: "Medical marijuana, when grown locally for personal consumption, does not have any direct or obvious effect on interstate commerce. Federal efforts to regulate it considerably blur the distinction between what is national and what is local." *Conant v. Walters*, 309 F.3d 629, 647 (9th Cir.2002) (Kozinski, J., concurring) (citation omitted). The district court in *County of Santa Cruz* also seriously questioned the strength of the link between such activities and interstate commerce. *See County of Santa Cruz*, 279 F.Supp.2d at 1209 ("The fourth factor—whether the link between [medical marijuana use] and a substantial affect on interstate commerce is attenuated—arguably favors Plaintiffs.").[8]  Therefore, we conclude that this factor favors a finding that the CSA cannot constitutionally be applied to the class of activities at issue in this case.

7. The CSA's congressional findings suggest that it is impractical to distinguish between controlled substances manufactured and distributed intrastate and those manufactured and distributed interstate. 21 U.S.C. § 801(5) ("Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, is it not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate."). Putting aside the question of whether feasibility can provide a basis for expanding congressional powers beyond those enumerated in the Constitution, *McCoy* provides a helpful resolution of this issue as it pertains to the class of activities at issue in this case:

> Furthermore, McCoy's factual circumstances, in which she possessed a family photo for her own personal use, with no intention to distribute it in interstate or foreign commerce, do not pose a law enforcement problem of interstate commercial child pornography trafficking. While it is true that child pornography "does not customarily bear a label identifying the state in which it was produced," such problems of identification are not present in this case. As we have emphasized, McCoy's "home-grown" photograph *never entered in and was never intended for interstate or foreign commerce.*

323 F.3d at 1132 (citation omitted) (quoting *United States v. Kallestad*, 236 F.3d 225, 230 (5th Cir.2000)). Applying this logic to the instant case, the feasibility of differentiating between the intrastate class of activities at issue here and more generic interstate drug trafficking is of no moment, as the marijuana in the instant case never entered into and was never intended for interstate or foreign commerce.

8. At oral argument, we questioned counsel for the appellants about the origin of the marijuana seeds used by the appellants. Counsel for the appellants assured us that they came from within California. Regardless, we find that the origin of the seeds is too attenuated an issue to form the basis of congressional authority under the Commerce Clause. In *McCoy* we discussed the fact that the film and camera in that case were manufactured out of state. We expressed "substantial doubt" that this fact (which was part of the statute's jurisdictional hook in that case) "adds any substance to the Commerce Clause analysis." *McCoy*, 323 F.3d at 1125. Here, the potential

On the basis of our consideration of the four factors, we find that the CSA, as applied to the appellants, is likely unconstitutional. *See McCoy,* 323 F.3d at 1124 ("It is particularly important that in the field of criminal law enforcement, where state power is preeminent, national authority be limited to those areas in which interstate commerce is truly affected. . . . The police power is, essentially, reserved to the states, *Morrison,* 529 U.S. at 618, 120 S.Ct. 1740. . . . That principle must guide our review of Congress's exercise of Commerce Clause power in the criminal law area."); *see also Morrison,* 529 U.S. at 610, 120 S.Ct. 1740 ("[A] fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case.").

Therefore, we find that the appellants have made a strong showing of the likelihood of success on the merits of their case.

B. *Hardship and Public Interest Factors*

■ The appellants contend that considerations of hardship and the public interest factors in this case require entry of the requested preliminary injunction.[9] The district court found that,

> [w]hile there is a public interest in the presumption of constitutional validity of congressional legislation, and while regulation of medicine by the FDA is also important, the Court finds that these interests wane in comparison with the

public interests enumerated by plaintiffs and by the harm that they would suffer if denied medical marijuana.

The district court nevertheless denied the injunction given its findings regarding the merits of the case: "[D]espite the gravity of the plaintiffs' need for medical cannabis, and despite the concrete interest of California to provide it for individuals like them, the Court is constrained from granting their request." We find that the hardship and public interest factors tip sharply in the appellants' favor.

There can be no doubt on the record as to the significant hardship that will be imposed on the patient-appellants if they are denied a preliminary injunction. The appellees do not dispute this. Instead, the appellees argue that *Oakland Cannabis Buyers' Cooperative* precludes a finding that the public interest favors the appellants. The appellees quote: "[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *Oakland Cannabis Buyers' Coop.,* 532 U.S. at 497, 121 S.Ct. 1711 (quotation marks omitted). However, the relevant portion of that case dealt with what factors a district court may consider when fashioning injunctive relief. *See id.* at 495–98, 121 S.Ct. 1711. It did not address the constitutional challenges at issue here that call the very foundation of the CSA into question as applied to the class of activities at issue in this case. Therefore, the Court's admonitions[10] are not

---

out-of-state production of seeds used by the appellants for their noncommercial activity is a significantly attenuated connection between the appellants' activities and interstate commerce. If the appellees sought to premise Commerce Clause authority in this case solely on the possibility that the seeds used by the appellants traveled through interstate commerce, we would conclude, as we did in *McCoy* with respect to the out-of-state manufacture of the film and camera, that this, by itself, "provides no support for the govern-

ment's assertion of federal jurisdiction." *Id.* at 1126; *see also United States v. Stewart,* 348 F.3d 1132, 1135 (9th Cir.2003).

9. The district court analyzed "the issue of irreparable harm, the balance of hardships, [and] the impact of an injunction upon the public interest" all under the heading "Public Interest Factors."

10. These admonitions include: "A district court cannot, for example, override Congress'

relevant to this case. It would be absurd for the Court to have meant that, no matter how strong the showing of unconstitutionality, the statute must be enforced.

The appellees also contend that granting the appellants' requested injunction would create a slippery slope as other plaintiffs seeking use of other schedule I controlled substances would bypass the statutory process established by Congress. The appellees claim that the appellants' proposed injunction therefore has the potential to significantly undermine the FDA drug approval process. Our holding is sufficiently narrow to avoid such concerns. Moreover, there is nothing contrary to the public interest in allowing individuals to seek relief from a statute that is likely unconstitutional as applied to them. The public interest of the state of California and its voters in the viability of the Compassionate Use Act also weighs against the appellees' concerns. *Cf. New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). Finally, the appellees' speculative slippery slope concern is weak in comparison to the real medical emergency facing the patient-appellants in this case.

## CONCLUSION

For the reasons discussed above, we reverse the district court. We find that the appellants have demonstrated a strong likelihood of success on the merits. This conclusion, coupled with public interest

considerations and the burden faced by the appellants if, contrary to California law, they are denied access to medicinal marijuana, warrants the entry of a preliminary injunction. We remand to the district court for entry of a preliminary injunction consistent with this opinion.

**REVERSED AND REMANDED.**

BEAM, Circuit Judge, dissenting.

It is simply impossible to distinguish the relevant conduct surrounding the cultivation and use of the marijuana crop at issue in this case from the cultivation and use of the wheat crop that affected interstate commerce in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Accordingly, I dissent.

**I.**

At the outset, I note a justiciability problem that has not been addressed by the parties, the district court or the opinion of the panel majority. Although plaintiffs assert an "as applied" challenge to the workings of the Controlled Substances Act (CSA), the pleadings and evidentiary showings do not disclose, except with one possible exception, that the CSA has actually been applied to any of plaintiffs' activities. This, of course, raises the question of whether this case is ripe for review and, in turn, whether plaintiffs have standing to bring this case before the court.

"[W]here it is impossible to know whether a party will ever be found to have violated a statute, or how, if such a violation is found, those charged with enforcing the statute will respond, any challenge to that statute is premature." *Alaska Airlines, Inc. v. City of Long Beach,* 951 F.2d

policy choice, articulated in a statute, as to what behavior should be prohibited." 532 U.S. at 497, 121 S.Ct. 1711; and "Their choice (unless there is statutory language to the contrary) is simply whether a particular

means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *Id.* at 497–98, 121 S.Ct. 1711.

977, 986 (9th Cir.1991). To satisfy Article III's standing requirements, a plaintiff must show that she has suffered a concrete and particularized injury in fact that is actual or imminent (not conjectural or hypothetical). Plaintiff must also show that the injury is fairly traceable to the challenged action of the defendant and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir.2003).

In determining whether these jurisdictional prerequisites are satisfied, a court must determine whether the plaintiff has a "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). In asking for injunctive relief, plaintiffs bear a special burden of showing real or immediate threat of irreparable injury when the conduct they are seeking to enjoin has not yet occurred-it is not enough to show past injury. *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996). And, the mere existence of a statute which plaintiffs feel they will be *forced* to violate is not sufficient to create an Article III case or controversy. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir.2000) (en banc).

In *San Diego County Gun Rights*, the court considered a pre-enforcement challenge to the constitutionality of the Violent Crime Control and Law Enforcement Act. The district court had dismissed the claims for lack of standing and ripeness because none of the individual plaintiffs had been prosecuted, arrested or incarcerated for violation of the Act. The plaintiffs challenged the Act on Commerce Clause grounds,[1] and argued they had standing based on, among other things, threat of future prosecution. The court noted that in order to show an imminent and genuine threat of future prosecution, the plaintiffs must have articulated concrete plans to violate the statute. 98 F.3d at 1127. Plaintiffs can meet this prong by showing that they have in the past violated the act and intend to continue engaging in prohibited acts in the future. *Id.* (citing *Babbitt*, 442 U.S. at 303, 99 S.Ct. 2301.) Next, there must be a specific threat of prosecution, and the plaintiffs bear the burden of showing that the act in question is actually being enforced. *Id.* A specific warning of prosecution may suffice, but "a general threat of prosecution is not enough to confer standing." *Id.* Finally, the plaintiffs can meet their burden to show standing in a threat-of-prosecution situation by showing past prosecutions under the act in question. *Id.* at 1128. Because the gun rights plaintiffs could not establish the foregoing requirements, they did not meet their burden of showing they had Article III standing for their claim. *Id.* at 1129.

With regard to ripeness, the court noted that the issue must be "fit for judicial decision" and that "the parties will suffer hardship if we decline to consider the issues." *Id.* at 1132. Because the issues were not "purely legal" and because the plaintiffs had not been threatened with prosecution, the court found that the claims were not ripe for adjudication. *Id.;* *see also Thomas*, 220 F.3d at 1138–39 (holding that landlords who vowed not to follow an anti-discrimination housing statute did not have a justiciable claim for injunctive relief when they had not yet violated the statute and had certainly not been prosecuted for any violation).

---

1. Plaintiffs also asserted claims pursuant to the Second and Ninth Amendments. The court dismissed these claims because redress of individual grievances was not cognizable under either amendment. 98 F.3d at 1125.

In this case plaintiffs allege three instances of injury in their prayer for relief. They ask the court to enjoin the DEA from: 1) arresting or prosecuting them or their caregivers for possession and/or cultivation of marijuana; 2) seizing their medical cannabis; 3) seeking civil or administrative sanctions against them or their caregivers-and to declare the CSA unconstitutional as applied to them through these acts. (Plaintiffs' Petition at 12–13). According to the petition, some of Monson's marijuana plants have already been seized, and past history suggests that if the DEA can find out where Raich's plants are, they will be seized as well. Thus, I concede that it is at least arguable that claim two, the "seizing" claim, may be actionable. However, applying *San Diego County Gun Rights* to the injuries alleged in claims one and three, it is clear that they are not ripe for review.

With regard to these two claims, the intent to violate the statute requirement is likely met. Plaintiffs have violated the CSA in the past, and indicate that they will continue to do so in the future. However, plaintiffs do not show there is a threat of future prosecution or a history of past prosecutions, at least as applied to their unique factual situations. I doubt whether anyone can or will seriously argue that the DEA intends to prosecute these two seriously ill individuals. *E.g.,* Alex Kreit, Comment, *The Future of Medical Marijuana: Should the States Grow Their Own?,* 151 U. Pa. L.Rev. 1787, 1799 n. 85 (2003) (noting that "DEA's limited resources make it practically impossible for its officers to enforce minor possession laws without extensive cooperation from state police").

While we can speculate on whether future prosecution is likely (given the fact that they are known users and possessors and they have not yet been arrested or prosecuted), it is the plaintiffs' burden to show standing, not this court's burden to disprove it. *Carroll v. Nakatani,* 342 F.3d 934, 945 (9th Cir.2003) ("The party invoking federal jurisdiction, not the district court, bears the burden of establishing Article III standing."). Because this particular issue was not briefed or argued by the parties, or mentioned by the district court, we should remand the case to the lower court to determine whether the threat of criminal prosecution and the possible levying of civil administrative penalties are matters which are ripe for review. I suggest that such a hearing will undoubtedly reveal that plaintiffs simply use this action to seek an advance judicial ruling on government actions that may never be applied to them or to similarly situated individuals, if any such persons presently exist in California.[2]

## II.

Because the plaintiffs arguably may have standing to assert one ripe claim of future injury, the seizure claim, I address the merits of their Commerce Clause arguments. In *Wickard,* an Ohio wheat farmer (Filburn) was fined for growing excess acres of wheat on his small farm. Filburn was charged with violation of the Agricultural Adjustment Act of 1938, which was enacted to control the volume of wheat moving in foreign and interstate com-

**2.** I respectfully disagree with the conclusion the court reaches in footnote one of its opinion with regard to remedies available to plaintiffs, even assuming that the court's constitutional conclusions are correct. A court has no power to provide a remedy for a claim over which it has no jurisdiction. And clearly, *California Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088 (9th Cir.2003), provides no support for the proposition the court announces in this regard. *Id.* at 1094 n. 2 (noting that the distinction between "standing" and "ripeness" label was largely immaterial). At best, under the posture of this case, the district court may enjoin seizure of plants, nothing more.

merce, an effort by Congress to address, in part, surpluses, shortages and resulting extreme price variations. Filburn asserted that the Act was an unconstitutional exercise of Congress's Commerce Clause powers because it purported to regulate farm-cultivated wheat milled into flour for on-the-farm family consumption and also used for producing poultry and livestock products which were partly consumed by the Filburn family.[3] The Court rejected this argument, stating, "even if [the] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.* at 125, 63 S.Ct. 82. The Court then found these activities constituted a substantial economic effect. *Id.* at 128–29, 63 S.Ct. 82.

Notably, the Court stated, "[t]hat appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28, 63 S.Ct. 82. Rationales in support of congressional regulation of how much wheat could be grown on an individual farm included: that wheat growing for whatever purpose was an important commercial enterprise in and among the various states; that wheat surplus and price fluctuations had been a significant economic problem; that several other wheat growing countries had instilled similar growing quotas and price guarantees; and that the direct and indirect consumption of wheat on the farm where it was grown was the "most variable factor in the disappearance of the wheat crop." *Id.* at 125–27, 63 S.Ct. 82.

Except for why the marijuana at issue in this case is consumed, i.e., for medicinal rather than nutritional purposes, plaintiffs' conduct is entirely indistinguishable from that of Mr. Filburn's. The Agriculture Adjustment Act reached Filburn's wheat growing activities, even that part of the crop grown, directly and indirectly, for family food consumed in the home on the Filburn farm. Here, under the precedent established in *Wickard,* the CSA clearly reaches plaintiffs' activities, even though they grow, or take delivery of marijuana grown by surrogates, for personal consumption as medicine in the home as permitted by California, but not federal, law.

In reaching its decision, the court defines the regulated class as "the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician." *Ante* at 1228. The *Wickard* Court could easily have defined the class of activities as "the intrastate, noncommercial cultivation of wheat for personal food purposes." Plaintiffs argue that *Wickard* is distinguishable because Filburn was engaged in the commercial activity of farming, while their activities are purely non-economic.[4] This argument fails on two fronts. The cultivation of marijuana for

---

**3.** It was Filburn's practice to use part of the grain from his "small acreage" of winter wheat to feed poultry and livestock on the farm, some of which products were consumed as food on the farm and also to use some of the wheat to make "flour for home consumption." The Supreme Court deemed all of Filburn's uses to be regulable by Congress. *Wickard,* 317 U.S. at 114, 128–29, 63 S.Ct. 82.

**4.** This "non-economic" argument apparently attempts to distinguish the usage in *Wickard*

from the usage allegations in this case. In *Wickard,* the 239 bushels of wheat produced from the disputed acres were deemed to have been slated for use as follows: a portion made into flour for home use, a portion sold locally as grain, a portion fed on the farm to produce poultry and livestock products with part of these products being consumed as food on the farm, and the balance kept for seed. *Wickard,* 317 U.S. at 114, 63 S.Ct. 82. However, the Supreme Court specifically focused on the

medicinal purposes is commercial in nature. The argument ignores the fungible, economic nature of the substance at issue-marijuana plants-for which there is a well-established and variable interstate market, albeit an illegal one under federal law. And, the growing of wheat for family consumption as flour, which was and is a legal enterprise in Ohio and other states, is as non-economic as it is possible to get with cultivated crops.

The Court in *United States v. Lopez*, 514 U.S. 549, 560–61, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) and *United States v. Morrison*, 529 U.S. 598, 610, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), expressly affirmed the continuing validity of *Wickard*. And, when put to the tests developed by *Lopez* and clarified in *Morrison*, the CSA clearly passes constitutional muster especially as applied to the plaintiffs. At the risk of some redundancy, I review each *Morrison* refinement under the allegations plaintiffs make in this case.

**A. Is this particular activity economic or non-economic, but necessarily regulated as part of a larger regulatory scheme?**

Even assuming that the court has correctly defined the class-"the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician"-the conduct at issue is subject to regulation. First, as earlier stated, I respectfully disagree with the court's insertion of the term "noncommercial" into the class definition

because the activity at issue here is economic. Plaintiffs are growing and/or using a fungible crop which *could* be sold in the marketplace, and which is also being used for medicinal purposes in place of other drugs which would have to be purchased in the marketplace. As also earlier indicated, this activity is essentially indistinguishable from the activity in *Wickard*, and our sister circuits have recognized the similarities. *See Proyect v. United States*, 101 F.3d 11, 14 (2d Cir.1996) (per curiam) (rejecting Commerce Clause challenge to a conviction under 21 U.S.C. § 841(a)(1) for growing marijuana even though there was no evidence that the drug was intended for interstate distribution). In *Proyect*, the court noted that cultivation of marijuana for individual use *did* affect commerce in the same way that Filburn's personal consumption of wheat did:

> In any event, the cultivation of marijuana for personal consumption most likely *does* substantially affect interstate commerce. This is so because "it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market." *Wickard v. Filburn*, 317 U.S. 111, 128, 63 S.Ct. 82, 91, 87 L.Ed. 122 (1942). As such, there is "no doubt that Congress may properly have considered that [marijuana] consumed on the [property] where grown if wholly outside the scheme of regulation would have a substantial effect" on interstate commerce. *Id.* at 128–29, 63 S.Ct. at 90–91.

*Proyect*, 101 F.3d at 14 n. 1.[5]

regulability of the home-consumption portion of the wheat saying, "[t]he effect of [home] consumption of home-grown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop." *Id.* at 127, 63 S.Ct. 82. Therefore, even though plaintiffs' usage of their marijuana crop is all personal, given *Wickard*, the plaintiffs, in their attempt to support this non-economic argu-

ment, seek to advance an immaterial factual distinction that leads to no legal difference between the two situations.

5. At footnote four of its opinion, the court attempts to distinguish the reach of *Proyect* by noting the involvement of 100 marijuana plants. We know that six cannabis plants were seized from Monson in just one instance and that Raich regularly receives an undis-

Similarly, cultivating marijuana for personal [6] use keeps plaintiffs from seeking an outside source of either marijuana, or possibly, a (federally) legally prescribed and dispensed drug such as Marinol-both of which are articles of interstate commerce. As with the wheat consumed as food by the Filburns, plaintiffs are supplying their own needs, here symptom-relieving drugs, without having to resort to the outside marketplace. This deportment obviously has an effect upon interstate commerce.

However, even if the word "non-economic" is rightly included within the court's class definition, plaintiffs' behavior is still reached if its regulation is essential to reaching the larger commercial activity. In *United States v. Leshuk*, 65 F.3d 1105 (4th Cir.1995), the court held that the *Lopez* opinion did not alter its previous holding that the possession prohibitions in the CSA were a constitutional exercise of Congress's powers pursuant to the Commerce Clause. *Id.* at 1112. Further, the court noted that the act was not

> unconstitutional *as applied* if his possession and cultivation were for personal use and did not substantially affect interstate commerce. Although a conviction under the Drug Act does not require the government to show that the specific conduct at issue substantially affected interstate commerce ... *Lopez* expressly reaffirmed the principle that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence."

*Id.* (quoting *Lopez*, 514 U.S. at 558, 115 S.Ct. 1624 (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968))) (emphasis added). *See also Proyect*, 101 F.3d at 14 (quoting the same passage from *Lopez*); *United States v. Wall*, 92 F.3d 1444, 1461 (6th Cir.1996) (Boggs, J., concurring and dissenting) (noting that noncommercial activity is subject to congressional oversight when "its regulation is an essential part of the regulation of some commercial activity").

Prior to *Lopez* and *Morrison*, this circuit held that the CSA does not violate the Commerce Clause. In *United States v. Visman*, 919 F.2d 1390 (9th Cir.1990), the court found that marijuana plants "rooted in the soil" (and therefore which could not have crossed state lines) *do* affect interstate commerce. *Id.* at 1392–93. The court deferred to Congress's findings that "controlled substances have a detrimental effect on the health and general welfare of the American people and that intrastate drug activity affects interstate commerce." *Id.* at 1393. Notably, the court held that "*local* criminal cultivation of marijuana is within a class of activities that adversely affects interstate commerce." *Id.* (emphasis added).

Then, in *United States v. Kim*, 94 F.3d 1247, 1250 (9th Cir.1996), this circuit affirmed the continuing validity of *Visman* in light of the *Lopez* decision. *See also United States v. Tisor*, 96 F.3d 370, 374 (9th Cir.1996) (rejecting Commerce Clause challenge to the CSA after *Lopez*). Furthermore, In *United States v. Bramble*,

---

closed amount of marijuana from her purported benefactors. Over time it is likely that many times over 100 plants will be consumed by these two users alone. Thus, the distinction the court attempts to reach is counterproductive to its arguments and actually supports the thrust of this dissent.

6. To use a well-known basketball term, this case would be a "slam dunk" against Ms. Raich if she were paying her remote suppliers to grow the marijuana she uses. As it is, the consideration the caregivers receive is knowing that Ms. Raich is purportedly in less pain because of their efforts.

103 F.3d 1475, 1479 (9th Cir.1996), the court affirmed, with little comment, the district court's rejection of the defendant's Commerce Clause challenge in his conviction for simple possession of marijuana. The *Bramble* district court noted congressional findings that local distribution and possession of illegal drugs contribute to ever increasing interstate drug trafficking. So, even though Bramble was guilty of only simple possession, it was clearly recognized that "there is an interstate market for illegal drugs." 894 F.Supp. 1384, 1395 (D.Haw.1995).

Of course, none of these cases involve the precise, unique facts involved in this litigation, where plaintiffs are medicinal users of marijuana, grow their own supply or obtain it free of charge from surrogate producers, and do so lawfully under state law. However, because the just-described conduct is still illegal under federal law, there is no meaningful distinction[7] between the simple possessor in *Bramble* and plaintiffs. If Congress cannot reach individual narcotic growers, possessors, and users, its overall statutory scheme will be totally undermined. The goal of the CSA is to prevent the interstate marijuana trade, even medicinal marijuana. Because plaintiffs' actions violate a federal statute, inclusion in the class formulation "for personal medical purposes on the advice of a physician" adds nothing to the analysis. While this result may seem unduly harsh since the plaintiffs are seriously ill, in the eyes of the DEA agent, there is no legal distinction between the simple user and possessor in *Bramble* and *Leshuk* and the plaintiffs.

That medicinal marijuana is acceptable in several states surrounding California also undermines the court's conclusion. Even if the plants are grown for purely medicinal purposes, it is probable that an interstate market for medicinal marijuana has developed with users from surrounding jurisdictions. All of this contributes to "swelling the interstate traffic in such substances." 21 U.S.C. § 801(4) (Congressional findings in support of the CSA). Thus, the activity in question here is almost certainly economic, but even if it is not, as held in *Lopez*, its regulation is essential for Congress's regulation of the larger economic activity of the drug trade.

**B. Does the CSA contain a jurisdictional element?**

A jurisdictional element is a specific provision in a federal statute which would require the government to establish facts "justifying the exercise of federal jurisdiction in connection with any individual application of the statute." *United States v. Rodia*, 194 F.3d 465, 471 (3d Cir.1999). There is nothing in the statute at issue here which makes a connection to interstate commerce an element of the offense.

**C. Were there adequate congressional findings?**

As noted in *Visman, Kim* and *Bramble*, the congressional findings in the CSA have already been relied upon by this circuit. *See also United States v. Rodriquez–Camacho*, 468 F.2d 1220, 1221–22 (9th Cir. 1972). Admittedly, the findings do not address the specific use at issue here-cultivation and personal use for medicinal purposes. However, because medicinal use is not permitted by federal law, I fail to see how this is a particularly relevant concern. Congressional findings contained in 21 U.S.C. § 801(4) specifically state that, "Local distribution and possession of controlled substances contribute to swell-

---

7. Admittedly, one distinction is that the possessor and user in *Bramble* purchased the marijuana, presumably from a dealer. But, as admitted at oral argument, plaintiffs and their surrogates obviously purchased the *seeds* from an outside source.

ing the interstate traffic in such substances." As pointed out above, plaintiffs' conduct does, or will, contribute to swelling the interstate traffic in marijuana, including medicinal marijuana.

### D. What is the extent of the attenuation between this conduct and interstate commerce?

Finally, the court contends that circuit precedent dictates that we recognize such a degree of attenuation between the plaintiffs' conduct and interstate commerce that the connection is effectively severed. I disagree. I begin by acknowledging the dicta in the concurring opinion in *Conant v. Walters*-"Medical marijuana, when grown locally for personal consumption, does not have any direct or obvious effect on interstate commerce." *Conant v. Walters*, 309 F.3d 629, 647 (9th Cir.2002) (Kozinski, J., concurring), *cert. denied,* —— U.S. ——, 124 S.Ct. 387, 157 L.Ed.2d 276 (2003). On the other hand, Congress contemplated individual growers, possessors and users when it made its findings regarding the CSA. 21 U.S.C. § 801(4). And, in light of the growing interstate community of medicinal marijuana users, the attenuation is not great, even, perhaps, nonexistent. Accordingly, an evaluation of any attenuation factor favors the CSA's constitutionality.

Plaintiffs, and the court, rely extensively on this circuit's decision in *United States v. McCoy*, 323 F.3d 1114 (9th Cir.2003), but the case does not bear the weight the court places on it. It is distinguishable in at least one [8] key respect-marijuana is a cultivated, fungible commodity that has objective and readily transferable value in the marketplace, as compared with the

noncommercial aspects of the home photograph taken by Ms. McCoy for her personal use. *See id.* at 1120. While it is clear that plaintiffs do not propose to sell or share their marijuana with others similarly situated (or even not similarly situated), they *could.* This is almost certainly not true of the *McCoy* family photograph.

This circuit's more recent decision in *United States v. Stewart*, 348 F.3d 1132, 2003 WL 22671036 (9th Cir.2003) does not alter my conclusions. In *Stewart*, a case that I respectfully believe was wrongly decided, the court invalidated the defendant's conviction for possession of five home-assembled machine guns. The court found that 18 U.S.C. § 922(*o*) was an invalid exercise of Congress's commerce power as applied to a defendant who assembled parts into a machine gun by himself at home. The court held that because only the machine gun *parts* moved in interstate commerce, and because the guns were unique in that they could only have been made by the defendant himself (they were not part of a machine gun "kit," akin to a "chair from IKEA"), the activity was, according to a majority of the panel, beyond Congress's commerce power. *Id.* at *3.

Purportedly applying the *Morrison* test, the *Stewart* court found that possessing machine guns was not economic activity. The court noted that "[w]hatever its intended use, without some evidence that it will be sold or transferred-and there is none here-its relationship to interstate commerce is highly attenuated." *Id.* at *4. Furthermore, the overall regulation did not have an economic purpose. *Id.* This gun regulatory scenario is distinguishable [9] from that of the CSA and the plaintiffs'

---

**8.** *McCoy* is also distinguishable because the issues there did not suffer from the standing and ripeness problems identified earlier. The *McCoy* defendant had been charged and convicted under the statute she was challenging "as applied."

**9.** *Stewart* is also distinguishable for the same reason as *McCoy,* identified in the immediately preceding footnote.

possession of the fungible, readily marketable economic commodity at issue here-the marijuana plants. There is nothing unique about Raich and Monson's marijuana seeds or the plants they produce, and in Raich's situation the marijuana plants were clearly "transferred" to her from her horticulturally inclined surrogates.

The *Stewart* court rejected the district court's reasoning that the activity was reachable because the parts had moved in interstate commerce, noting "[a]t some level, of course, everything we own is composed of something that once traveled in commerce." *Id.* at \*2. With respect, I disagree, and a prime example of the frailty of this reasoning is Mr. Filburn's home-consumed wheat. Unless we trace the components of that wheat to an unacceptable level (and argue that the nitrogen and other nutrients taken up through the roots, the oxygen absorbed through the leaves and the water absorbed from the soil, all in furtherance of the wheat's growth process, had moved in interstate commerce), I don't believe that the commodity involved in *Wickard* was composed of any parts that had ever moved in interstate commerce.[10] Yet the grain was still deemed by the Supreme Court to be the proper subject of congressional regulation through the commerce power. If Mr. Filburn's wheat production for home use was federally regulable, and *Wickard v. Filburn* remains binding precedent in this and every other circuit, as it does, plaintiffs' marijuana plants are subject to congressional regulation under the CSA.

### III.

Three out of the four *Morrison* factors favor regulation, and the conduct in this case is indistinguishable from the conduct

at issue in *Wickard v. Filburn*. Accordingly, I dissent.

---

10. With further respect, and for similar reasons, I think it might come as a surprise to a mid-Nebraska cattle rancher that the baby calf born on his property and ultimately subject to numerous federal agricultural regulations was composed of parts that had moved in interstate commerce.